**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090 | MDL No. 2804<br><br>Hon. Dan Aaron Polster |

**DISTRIBUTORS' OBJECTIONS TO MAGISTRATE JUDGE'S
OCTOBER 5, 2018 REPORT AND RECOMMENDATION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.      THE R&R'S CONSPIRACY ERRORS. ............................................................... 2

II.     THE R&R'S RICO "BUSINESS OR PROPERTY" ERRORS. ........................... 4

        A.      The County May Not Recover for Injuries that Flow from Personal Injury. ......... 4

        B.      The County May Not Recover for Injury to Governmental Interests. .................... 5

        C.      The County May Not Recover for Lost Tax Revenue. ........................................... 7

III.    THE R&R'S PROXIMATE CAUSATION ERRORS. ........................................... 7

        A.      The R&R Misapplied the *Holmes* Direct Injury Test. ......................................... 7

        B.      The *Holmes* Factors also Counsel in Favor of Dismissal. .................................. 10

IV.     THE R&R'S OPLA ABROGATION ERROR. ..................................................... 12

V.      THE R&R'S NEGLIGENCE/DUTY ERRORS ................................................... 13

VI.     THE R&R'S ECONOMIC LOSS DOCTRINE ERROR. ................................... 15

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Am. Dental Ass'n v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) ........................................................................10

*Bank of Am. Corp. v. City of Miami*,
  137 S. Ct. 1296 (2017)........................................................................................10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................................................4, 15

*Bennett v. Berg*,
  685 F.2d 1053 (8th Cir. 1982) .............................................................................6

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
  519 F.3d 969 (9th Cir. 2008) ...............................................................................6

*Chem. Solvents, Inc. v. Advantage Eng'g, Inc.*,
  2011 WL 1326034 (N.D. Ohio Apr. 6, 2011)....................................................13

*City of Cleveland v. Ameriquest Mortg. Secs., Inc.*,
  615 F.3d 496 (6th Cir. 2010) ...............................................................7, 8, 11, 12

*Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*,
  528 F.3d 1001 (8th Cir. 2008) ...........................................................................10

*Driessen v. Woodforest Nat. Bank*,
  940 F. Supp. 2d 584 (S.D. Ohio 2013) ..............................................................14

*Gross v. Waywell*,
  628 F. Supp. 2d 475 (S.D.N.Y. 2009).................................................................10

*Guaranteed Rate, Inc. v. Barr*,
  912 F. Supp. 2d 671 (N.D. Ill. 2012) .................................................................10

*Gucwa v. Lawley*,
  731 F. App'x 408 (6th Cir. 2018) .....................................................................4, 5

*Hawaii v. Standard Oil Co.*,
  405 U.S. 251 (1972)..............................................................................................6

*Hemi Grp., LLC v. City of New York*,
  559 U.S. 1 (2010)....................................................................................7, 10, 11

*Holmes v. Securities Investor Protection Corp.*,
  503 U.S. 258 (1992)...................................................................................... *passim*

ii

*Ill. Dep't of Revenue v. Phillips*,
   771 F.2d 312 (7th Cir. 1985) ...................................................................................6

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris*
   *Inc.*,
   196 F.3d 818 (7th Cir. 1999) ...................................................................................3

*Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*,
   731 F.3d 556 (6th Cir. 2013) (en banc) ...............................................................4, 6

*Kerrigan v. ViSalus, Inc.*,
   112 F. Supp. 3d 580 (E.D. Mich. 2015).................................................................10

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
   191 F.3d 229 (2d Cir. 1999).....................................................................................8

*Leen v. Wright Med. Tech., Inc.*,
   2015 WL 5545064 (S.D. Ohio Sept. 18, 2015) ....................................................13

*McKinney v. Microsoft Corp.*,
   2011 WL 13228141 (S.D. Ohio May 12, 2011) ....................................................13

*Michigan v. Fawaz*,
   848 F.2d 194 (6th Cir. May 9, 1988) .......................................................................6

*Mitchell v. Proctor & Gamble*,
   2010 WL 728222 (S.D. Ohio Mar. 1, 2010) .........................................................13

*In re Neurontin Marketing & Sales Practices Litigation*,
   712 F.3d 21 (1st Cir. 2013)......................................................................................9

*Perry v. Am. Tobacco Co.*,
   324 F.3d 845 (6th Cir. 2003) ............................................................................8, 10

*Price v. Pinnacle Brands, Inc.*,
   138 F.3d 602 (5th Cir. 1998) ...................................................................................7

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979)..................................................................................................6

*Schacht v. Brown*,
   711 F.2d 1343 (7th Cir. 1983) .................................................................................6

*Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*,
   249 F.3d 1068 (D.C. Cir. 2001) .............................................................................12

*Stratford v. SmithKline Beecham Corp.*,
   2008 WL 2491965 (S.D. Ohio June 17, 2008) .....................................................13

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ...................................................................................4

*Trans Rail Am., Inc. v. Hubbard Twp.*,
    478 F. App'x 986 (6th Cir. 2012) .............................................................................2

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) ...................................................................................4

*United States v. Gimbel*,
    830 F.2d 621 (7th Cir. 1987) ...................................................................................7

*Welborn v. Bank of N.Y. Mellon Corp.*,
    557 F. App'x 383 (5th Cir. 2014) (per curiam) .......................................................6

## STATE CASES

*City of Cincinnati v. Beretta U.S.A. Corp.*,
    768 N.E.2d 1136 (Ohio 2002)..................................................................12, 14, 15

*Herakovic v. Catholic Diocese of Cleveland*,
    2005 WL 3007145 (Ohio Ct. App. Nov. 10, 2005) .................................................7

*Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*,
    653 N.E.2d 661 (Ohio 1995)..................................................................................15

*Wallace v. Ohio Dep't of Commerce*,
    773 N.E.2d 1018 (Ohio 2002)..........................................................................13, 14

## OTHER AUTHORITIES

21 C.F.R. § 1301.74(b) ...............................................................................................3

21 C.F.R. §§ 1303.21-.23............................................................................................3

Ohio Rev. Code § 2307.71(A)(13) ............................................................................12

Ohio Rev. Code § 2307.71(B) ...................................................................................13

Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs,
    and Health (2016) ....................................................................................................9

Two critical defects taint the Report and Recommendation ("R&R").[1]  First, the R&R uncritically adopts Plaintiffs' conclusory allegations of a "conspiracy" between Distributors and Manufacturers.  On that basis, it repeatedly relies on the allegedly deceptive marketing conduct of Manufacturers to conclude that Plaintiffs state a claim against "Defendants."  The R&R (at 30) cites allegations that Manufacturers' fraudulent marketing targeted doctors to conclude that over-prescribing and mis-prescribing opioids was foreseeable and, therefore, that "Defendants'" conduct proximately caused the County's injury, without any acknowledgment that Distributors are not alleged to have played a role in Manufacturers' "multi-pronged" marketing campaign.  This error is especially acute in the RICO context because it denied each Distributor its right under well-established law to have its liability under RICO separately evaluated.

Second, the R&R repeatedly holds that discovery is needed before issues can be resolved—even when the questions are purely legal.  It is black-letter law that pecuniary losses flowing from personal injury, including medical expenses, may not be recovered under RICO. Yet the R&R (at 23–24) inexplicably concludes that "discovery" and a "full record" are needed to dismiss claims that undeniably flow from personal injury, including claims for "healthcare and treatment costs."  The R&R similarly ducks Distributors' argument that they have no common-law duty to the County to halt or report suspicious pharmacy orders, stating that the issue cannot be decided "based upon the limited record."  *Id.* at 79.  But it is black-letter law that the existence of a legal duty is a matter of law.

In failing to confront and resolve the important legal issues presented by Distributors' motion, and by ignoring key Distributor-specific arguments, the R&R kicks the can down the

---

[1]  The result is a larger number of errors than Distributors have space to address, given the significant page limits for these Objections.  Distributors thus incorporate the Objections of the Pharmacy and Manufacturer Defendants, and their opening brief, Dkt. 491–1 ("Br.") and reply brief, Dkt. 744 ("Reply").

road to summary judgment.  Distributors respectfully submit that, unless the Court corrects these manifest errors, resolution of the many MDL cases will be difficult to achieve until after Distributors' arguments are addressed by either the Sixth Circuit or the Ohio Supreme Court, whether upon certification by this Court or after a final judgment is entered.

## I.      THE R&R'S CONSPIRACY ERRORS.

The R&R erred in concluding that the County properly pled a conspiracy involving Distributors.  *See* Br. 52–54.  While no one contends that "pinpoint accuracy" is the test, the Federal Rules require that "conspiracy claims must be plead with some degree of specificity." *Trans Rail Am., Inc. v. Hubbard Twp.*, 478 F. App'x 986, 988 (6th Cir. 2012).  Ignoring this rule, the R&R (at 10, 37) accepted the County's conclusory allegation that Distributors and Manufacturers "operated together as a united entity," and so attributes Manufacturers' alleged wrongdoing to Distributors without any independent analysis.  That was serious error.

The R&R (at 96–97) identifies three unlawful activities that Distributors allegedly conspired to commit:  (1) fraudulently marketing opioids; (2) fraudulently increasing the supply of opioids by seeking increased quotas; and (3) failing to report suspicious orders.  None supports a conspiracy claim.

First, the Complaint alleges ***no facts*** to support the assertion that Distributors participated in the marketing of opioids.  It does not allege that Distributors worked in concert with "front groups" or "key opinion leaders," promoted opioids to doctors or patients, or did anything else to increase the number of opioid prescriptions written by doctors.  Indeed, the County defines "Marketing Defendants" to ***exclude*** Distributors.  Compl. ¶ 106.  The R&R thus erred in concluding that Distributors played any role in an alleged marketing conspiracy.

Second, the Complaint alleges ***no facts*** to support the conclusion that Distributors participated in applying or lobbying for increased opioid production quotas from DEA.  Nor are

Plaintiffs' conclusory allegations plausible. The regulatory scheme calls for Manufacturers, not Distributors, to submit the quota applications to DEA. 21 C.F.R. §§ 1303.21-.23. There is no allegation that Distributors joined in Manufacturers' applications or supported them in any way during the notice and comment period.[2]

Third, the Complaint alleges **_no facts_** to support the claim that Distributors conspired not to report "the unlawful distribution practices of their competitors to the authorities." Compl. ¶ 1130. This conclusory allegation, too, is implausible. One Distributor has no way of knowing if a competitor is receiving suspicious pharmacy orders and not reporting them. The R&R (at 47) also is mistaken that the "plain text" of 21 C.F.R. § 1301.74(b) requires registrants to report suspicious orders both from their customers and from all others in the supply chain. Section 1301.74(b) requires each registrant to "design and operate a system to disclose to the registrant suspicious orders" from its customers, then to report those orders to DEA. DEA has never interpreted § 1301.74(b) to require wholesale distributors to identify suspicious orders placed with competitors, likely because it would be impossible for them to do so.

The allegations that purport to tie Distributors to the wrongful conduct concern their participation in the trade association HDA. _E.g._, Compl. ¶¶ 534–44; R&R 9–10. The R&R (at 37) concludes that the County pled "much more" than mere membership in a trade organization, but references nothing beyond typical and non-inculpatory features common to all trade associations, such as that the HDA created a "network" where its members "could form relationships and create alliances and hold strategic business discussions." While the Complaint

---

2   Even had Distributors lobbied alongside Manufacturers, the _Noerr-Pennington_ doctrine—ignored completely by the R&R—precludes any liability for that conduct. _E.g._, _Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc._, 196 F.3d 818, 826 (7th Cir. 1999) ("To the extent the manufacturers' statements were designed to influence Congress—to get favorable laws and ward off unfavorable ones—they cannot be a source of liability directly under the _Noerr–Pennington_ doctrine."); _see_ Reply 13.

is specific about the association's various committees and working groups (on business technology, supply chain logistics, government affairs, contract administration, etc., Compl. ¶ 541), it is wholly conclusory about anything remotely nefarious.  The "syllogism" implicit in the Complaint is that (i) Distributors were members of HDA, (ii) membership gave them the opportunity to work in concert with Manufacturers, therefore (iii) Distributors and Manufacturers worked in concert to "engage in the unlawful sale of prescription opioids."  Compl. ¶ 543.  This kind of pleading logic is precisely what *Twombly* prohibits.[3]

## II.    THE R&R'S RICO "BUSINESS OR PROPERTY" ERRORS.

The R&R erred in concluding that the County alleged injury to its "business or property."

### A.    The County May Not Recover for Injuries that Flow from Personal Injury.

The R&R correctly recognized that, under controlling Sixth Circuit precedent, "both personal injuries and ***pecuniary losses flowing from those personal injuries*** fail to confer relief under [RICO]."  *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 565–66 (6th Cir. 2013) (en banc).[4]  Rather than apply this rule, however, the R&R concluded that discovery is needed to determine whether the County's claimed injuries "flow from" personal injury.  R&R 23–24 & n.18.  That conclusion was error.  *See Jackson*, 731 F.3d at 565–66 (applying this rule on a motion to dismiss); *Gucwa v. Lawley*, 731 F. App'x 408, 412–13 (6th Cir. 2018) (same).

---

[3] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (an allegation of "parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (allegations that executives "met frequently" and had "opportunit[ies] to conspire" do not plausibly allege conspiracy); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (dismissing conspiracy claim that failed to allege the "who, what, where, when, how or why").

[4] Unless otherwise noted, these Objections add all emphasis in quotations and omit citations and internal quotation marks.

The R&R ignored the County's concession that healthcare and medical expenses flow from personal injury.  In the face of clear Sixth Circuit law holding that "personal injuries and their associated pecuniary losses—including *medical expenses*—*do not confer relief under* [*RICO*]," *Gucwa*, 731 F. App'x at 412, the Opposition made no effort to defend the RICO claim for such expenses.  Dkt. 654 ("Opp."), 36–37.  No amount of discovery could make the County's claims for "healthcare and treatment costs"—i.e., medical expenses—cognizable.

The R&R (at 23) erroneously states that "Defendants fail to meaningfully differentiate among the categories" of damages.  But there is no basis for differentiation: each and every category of damages clearly flows from the increased level of opioid addiction (and overdose episodes) attributed to Defendants' conduct.  Without the increased levels of addiction—i.e., without the opioid "epidemic"—the County would not have incurred any increased costs.  The County itself admits this, stating that all 13 categories of injury "logically, directly and foreseeably arise from the opioid-addiction epidemic," which it defines by reference to opioid addiction and overdose.  Compl. ¶ 933; *see id.* ¶¶ 4–5, 16, 18, 20, 23–24.  The costs of training and equipping first responders—police, firefighters, and emergency personnel—are, by definition, costs flowing from personal injury: it is individuals afflicted by addiction that the County is "responding" to (¶ 934(c), (d), (e), (h)), prosecuting (¶ 934(i)), and cleaning up after.  And the lost tax revenue flows from addicts who work with "decreased efficiency" (¶ 934(k)) or drive down property values (¶ 934(*l*)–(m)).  Accordingly, the R&R erred in failing to dismiss the RICO claim for failure to plead a cognizable "business or property" injury.

### B.    The County May Not Recover for Injury to Governmental Interests.

The R&R also erred in holding that the County may recover under RICO for the costs of government services.  The weight of Circuit authority holds that a government can assert a RICO claim only for injury to its "commercial interests"—i.e., "injuries suffered in its capacity as a

consumer of goods and services"—but not for "general injury to the economy or to the Government's ability to carry out its functions." *Welborn v. Bank of N.Y. Mellon Corp.*, 557 F. App'x 383, 387 (5th Cir. 2014) (per curiam). In other words, money "expended on public health care and law enforcement services" by a city or county does not constitute injury to "business or property" under RICO. *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 971 (9th Cir. 2008).

The R&R (at 15) mistakenly departed from the holdings of the Fifth and Ninth Circuits because no "Supreme Court or Sixth Circuit case [is] directly on point with the facts of this case." But the Supreme Court has held that the phrase "business or property" refers "to commercial interests or enterprises." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 264 (1972). The R&R (at 16) suggests that "the language in the *Hawaii* decision was greatly softened by [*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979)]," but that is not so. *Reiter* reaffirmed that a government may recover only in its capacity "as a party to a commercial transaction," not for damage to its "general economy." 442 U.S. at 341–42. No court of appeals has allowed a claim for governmental expenditures under RICO. *Schacht v. Brown*, 711 F.2d 1343, 1357–58 (7th Cir. 1983), and *Bennett v. Berg*, 685 F.2d 1053 (8th Cir. 1982), do not do so. Both cases hold merely that a "competitive" injury is not required under RICO.[5] The R&R thus erred by adopting an approach contrary to the law in two Circuits and adopted by none.

---

[5] *Ill. Dep't of Revenue v. Phillips*, 771 F.2d 312, 316 (7th Cir. 1985), too, does not hold that a government may recover for costs incurred in providing services to residents. While that 33-year-old decision did "reluctantly" hold that failure to pay taxes is a cognizable RICO injury, the decision is inconsistent with the Sixth Circuit's holding that plaintiffs must allege a "proprietary type of damage" to state a RICO claim, *Jackson*, 731 F.3d at 565, and was expressly rejected by the Sixth Circuit in a case involving "quite similar" circumstances, *Michigan v. Fawaz*, 848 F.2d 194 (Table) (6th Cir. May 9, 1988) ("Because our doubts have ripened into a conviction that RICO does not apply to the circumstances of this case, we are not persuaded to adopt the reasoning of [*Phillips*].") *Phillips* is also distinguishable for the reasons discussed in Part II.C.

### C.     The County May Not Recover for Lost Tax Revenue.

The R&R also erred in holding that the County may recover for injuries to its "revenue-generating function."  Reply 4–6.  The handful of cases the R&R cites (at 14) stand only for the proposition that the government has a property interest in taxes that are legally due.  None stands for the proposition that a government has a property interest in taxes that might have been paid if property values had not declined or residents had been more productive.  The cases of which Distributors are aware hold the opposite—that there is no property interest in taxes that have not yet become due.  *United States v. Gimbel,* 830 F.2d 621, 626–27 (7th Cir. 1987) (no "business or property" interest in tax revenues that might have become due but for defendant's alleged misconduct); *see Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) ("Injury to mere expectancy interests … is not sufficient to confer RICO standing.").

## III.    THE R&R'S PROXIMATE CAUSATION ERRORS.

### A.     The R&R Misapplied the *Holmes* Direct Injury Test.

The R&R erred in concluding that the County alleged a ***direct*** causal connection between its harm and Distributors' alleged wrongdoing.  Under *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), a RICO plaintiff must allege a "direct relation between the injury asserted and the injurious conduct alleged."  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010).  "A link that is too remote, purely contingent, or indirec[t] is insufficient."  *Id.*  Theories of causation cannot "***go beyond the first step***."  *Id.* at 10–11.[6]

---

[6] The *Holmes* direct injury test applies with full force to Plaintiffs' Ohio-law claims.  *E.g.*, *Ameriquest*, 615 F.3d at 504 ("the Supreme Court's application of *Holmes* … is instructive and consistent with how we believe the Ohio Supreme Court would consider this matter because the Ohio Supreme Court has previously adopted the directness requirement precedent of the United States Supreme Court"); *Herakovic v. Catholic Diocese of Cleveland*, 2005 WL 3007145, at *5 (Ohio Ct. App. Nov. 10, 2005) (because the OCPA "is patterned after the federal RICO law, *we adopt the same position as that in Holmes*[], *which requires proof of proximate cause in an OPCA claim*").  Thus, for the reasons set forth in Part III, the R&R also erred in concluding that the County adequately alleged proximate causation under Ohio law.

The County's theory of causation impermissibly travels far beyond what the law allows. The core of Distributors' alleged misconduct is the failure to report or halt suspicious orders. But the R&R makes no effort to explain how Distributors' alleged failure ***directly*** harmed the County.  The medicines delivered by Distributors would not have left pharmacy shelves—and the County would not have paid a penny more in services related to addiction—unless (i) doctors mis-prescribed the medications, (ii) pharmacists dispensed them in the absence of a valid prescription, (iii) patients unlawfully sold or gave away their medicines, and/or (iv) individuals stole the medicines from those to whom they were lawfully prescribed.

The R&R asserts (at 27) that the County's injuries are not "so remote as to bar any potential recovery" because the County "ha[s] been impacted by the opioid epidemic," but that is not sufficient, as Sixth Circuit precedent demonstrates.[7]  In *Ameriquest*, there was no question that the City of Cleveland was adversely impacted by the foreclosure crisis that defendants allegedly helped create.  615 F.3d at 506.  And in the tobacco litigation (where the Sixth Circuit in *Perry* endorsed the unanimous holdings of eight courts of appeals), it was well understood that the government, hospital, and insurer plaintiffs all had incurred dramatically increased costs as a result of smoking-related illnesses.  Yet the Sixth Circuit twice held that these indirect impacts were insufficient as a matter of law.  Plaintiffs' causal theory also is impermissibly derivative.[8]

The R&R (at 30) places considerable weight on the allegation that "Defendants … specifically targeted physicians" with a deceptive advertising campaign designed "to influence physicians' prescribing decisions and to abolish concern regarding opioid addiction/abuse."

---

[7] *City of Cleveland v. Ameriquest Mortg. Secs., Inc.*, 615 F.3d 496 (6th Cir. 2010); *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 850 (6th Cir. 2003); *see* Br. 11–16.

[8] *Supra* Part II.A; *see* Br. 14–15; *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 239 (2d Cir. 1999) (dismissing RICO claims against tobacco companies under *Holmes* because "[w]ithout injury to the individual smokers, the [plaintiffs] would not have incurred any increased costs").

Based on the existence of this campaign, the R&R concludes (at 30), "physicians' act of writing prescriptions [does not] break[] the causal chain."  But these targeting allegations are irrelevant *as to Distributors*.  *See supra* Part I.  The R&R, by asserting (at 30) that "Defendants" allegedly targeted physicians "with their advertising," fails to acknowledge this critical distinction.[9]

The R&R (at 32–33) asserts that "third party criminal acts" do not "break the chain of causation" because a substantial portion of the alleged damages "were caused by the legal prescription of opioids."  That conclusion, however, makes no sense *as to Distributors*.  If Manufacturers' allegedly fraudulent marketing campaign changed the guidelines for prescribing opioids and thereby induced doctors to write ever-higher numbers of "legal" opioid prescriptions, then the pharmacy orders based on those prescriptions were not "suspicious," but reflected the new, more liberal prescribing guidelines, including long-term use at ever-higher doses, for chronic pain.  Compl. ¶¶ 10–12, 488–94.

Insofar as the claim is that Distributors failed to prevent "diversion" by shipping suspicious pharmacy orders, the R&R lost sight of the fact that diversion is the "transfer of any legally prescribed controlled substance from the person for whom it was prescribed to another person for any illicit use."[10]  Thus, by definition, diversion involves criminal activity—whether in the form of a doctor who knowingly writes a medically unnecessary prescription, a pharmacist who dispenses absent a legitimate prescription, a patient who gives away or sells his medicine, or

---

[9]  The R&R's reliance on *In re Neurontin Marketing & Sales Practices Litigation*, 712 F.3d 21 (1st Cir. 2013), is mistaken *as to Distributors* for this same reason.  There, the plaintiffs alleged that a pharmaceutical manufacturer conspired with a web of entities to market a dangerous prescription drug for off-label use, deceiving doctors into prescribing it widely.  The court held that the intervening conduct of physicians did not break the causal chain because the manufacturer targeted doctors with a "fraudulent marketing" scheme designed to influence the doctors' prescribing decisions.  *Id.* at 39.  *Neurontin* is irrelevant as to Distributors because they did not allegedly participate in any fraudulent marketing.

[10]  Facing Addiction in America:  The Surgeon General's Report on Alcohol, Drugs, and Health, glossary at 2 (2016), https://addiction.surgeongeneral.gov/sites/default/files/surgeon-generals-report.pdf.

a thief who takes drugs from the medicine cabinet. The intervening criminal conduct of a third party therefore ***necessarily*** stands between Distributors' alleged wrongdoing and any injury to the County.[11]

Finally, the R&R leans heavily on Plaintiffs' allegations of a "conspiracy" among Distributors and Manufacturers. For the reasons explained in Part I above, the County's conspiracy allegations are conclusory and implausible. The R&R's failure critically to examine the conspiracy allegations means that it failed to undertake the required analysis of whether the County adequately alleged a substantive RICO violation on the part of each Defendant, as the law requires. *Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 602 (E.D. Mich. 2015) ("[E]ach Defendant is entitled to an individualized analysis of his, her, or its own RICO liability.").[12] Had the R&R conducted the required analysis, it would have concluded that Distributors' alleged wrongdoing was not a direct cause of Plaintiffs' harm. Br. 11–15; Reply 6–8.

### B.    The *Holmes* Factors also Counsel in Favor of Dismissal.

The R&R erred in how it applied the three *Holmes* "policy factors." As noted, the attenuated and derivative chain of causation alleged in the Complaint requires dismissal of

---

[11]  The R&R (at 33) suggests that the criminal conduct of third parties should have been "foreseeable to [Distributors]." That suggestion is both incorrect, *see* Reply 26–27, and irrelevant. The concepts of directness and foreseeability are distinct, and in the RICO context, it is not enough to allege that an indirect injury was the "foreseeable" or even "intended" consequence of the defendants' conduct. *Hemi*, 559 U.S. at 12; *accord Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017) (foreseeability is insufficient to establish proximate causation); *Perry*, 324 F.3d at 850 ("Though foreseeability is an element of the proximate cause analysis, it is distinct from the requirement of a direct injury.").

[12]  *See Gross v. Waywell*, 628 F. Supp. 2d 475, 495 (S.D.N.Y. 2009) ("lumping the defendants into collective allegations results in a failure to demonstrate the elements of § 1962(c) with respect to each defendant individually, as required"); *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 685 (N.D. Ill. 2012) ("Where, as here, the plaintiff brings RICO claims against multiple defendants, the plaintiff must plead sufficient facts to notify each defendant of his alleged participation in the scheme."); *see also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) ("The plaintiff must allege facts with respect to each defendant's participation in the fraud."); *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027–28 (8th Cir. 2008) (similar).

Distributors irrespective of those policy factors.  *See, e.g.*, *Hemi*, 559 U.S. at 8–11 (dismissing allegations on remoteness grounds without applying the *Holmes* factors); *Ameriquest*, 615 F.3d at 503 ("all three factors do not need to be present for remoteness to bar discovery").  In any event, the *Holmes* policy factors also favor dismissal.

**Directness.**  The first *Holmes* factor is grounded in the recognition that "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors."  503 U.S. at 269.  Here, the connection between Distributors' alleged conduct and the County's alleged injury is highly attenuated and indirect.  Take, for example, the County's claim for lost "tax revenue" due to "decreased efficiency."   Compl. ¶ 902.   In order to establish that a given Distributor is responsible, it would be necessary to identify who exactly was a less efficient worker, to measure the loss of efficiency, and to determine whether:

- the decrease in efficiency is due to opioid use or abuse, or some other cause;

- the user (and/or her doctor) was a victim of Manufacturers' alleged deceptive marketing campaign (in which case no Distributor would be liable);

- criminal acts—be it the user herself stealing or otherwise improperly obtaining the drugs or a "pill mill" doctor writing prescriptions in the absence of a legitimate medical need—were the immediate cause of the user's addiction or overdose; and

- a given Distributor was responsible for supplying a "suspicious pharmacy" order that had any impact on the user's efficiency.

In short, it would be impossible to tell whether the County's purported injuries are due to a given Distributor's failure to report or halt a suspicious pharmacy order, as opposed to myriad other, independent factors.

**Apportionment of damages.**  The second *Holmes* factor is based on the concern that "recognizing claims of the indirectly injured would force courts to adopt complicated rules

apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries."  503 U.S. at 268.  This concern is present in spades.  Absent a prohibition on recovery for indirect and derivative injuries, numerous parties—including (but by no means limited to) the directly-injured user and the city, county, and state where he lives—all could seek recovery based on the same exact underlying injury.

  ***Direct victims can sue***.  The final *Holmes* factor is an inquiry into whether more directly injured victims can bring suit.  *Id*. at 269–70.  Of course individual opioid users can sue if (as the Complaint alleges) Distributors' wrongdoing led them to become addicts or to overdose.[13]

## IV. THE R&R'S OPLA ABROGATION ERROR.[14]

  The R&R erred in concluding that the Ohio Products Liability Act ("OPLA") does not abrogate the County's common-law claims.  The Complaint focuses on the promotion (by Manufacturers) and sale (by Distributors and Pharmacies) of prescription opioids—different activities in the chain of supply, but both comprehended by the OPLA term "marketing."  The 2005 post-*Beretta* amendments to the OPLA define a preempted "product liability claim" as any claim involving "[t]he design, formulation, production, construction, creation, assembly, rebuilding, testing, ***or marketing***" of a product.  Ohio Rev. Code § 2307.71(A)(13).  The General Assembly intended these amendments to abrogate all common-law product liability causes of

---

[13] *See* Dkt. 684–1, Part I (discussing lawsuits by individual opioid users); *Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1074 (D.C. Cir. 2001) ("[I]ndividual smokers may be counted on to vindicate the public interests at stake in the third factor by asserting various theories of recovery against the tobacco industry."); *Ameriquest*, 615 F.3d at 506 (dismissing RICO claim in part because "more immediate victims can sue to the extent that the Defendants violated any laws").

[14] As an initial matter, the Court should certify this issue to the Ohio Supreme Court for the reasons set forth in the memorandum, filed contemporaneously with these Objections.  If the Court denies that motion, it should overrule the R&R on this issue.

action, Ohio Rev. Code § 2307.71(B); *see* 2004 Am. Sub. S.B. No. 80, and since that time, Ohio courts have consistently looked askance at efforts to plead around the OPLA.[15]

The R&R's analysis of the OPLA, like its analysis of RICO, fails to recognize that the County's claims of injury all derive (or flow) from opioid use and abuse by County residents (i.e., from personal injury). *See supra* Part II. The Complaint makes clear that the County's alleged economic injuries stem directly from physical injuries—in the form of addiction and overdose—to County residents.[16] Because its injuries flow from precisely the sort of product-related injuries that give rise to OPLA preemption, the R&R erred in concluding that the County escaped the statute's reach by claiming only economic damages.[17]

## V. THE R&R'S NEGLIGENCE/DUTY ERRORS.

Whether a legal duty runs from Distributors to the County is a legal question, not a factual one. *Wallace v. Ohio Dep't of Commerce*, 773 N.E.2d 1018, 1026 (Ohio 2002). The

---

[15] *Stratford v. SmithKline Beecham Corp.*, 2008 WL 2491965, at *5 (S.D. Ohio June 17, 2008) ("The actionable conduct that forms the basis of the negligence claim … is the same conduct that the OPLA defines as giving rise to a 'products liability claim.'"). Claims do not shed their "product liability" character merely because the plaintiff seeks to recover only downstream economic losses. *Mitchell v. Proctor & Gamble*, 2010 WL 728222, at *4 (S.D. Ohio Mar. 1, 2010) ("[Plaintiffs] cannot separate out [their] claims from the purview of the OPLA simply by claiming only economic losses.").

[16] *See, e.g.*, Compl. ¶ 20 (the County bore the cost "of addiction and overdose"); *id.* ¶ 728 ("Opioid addiction and misuse … result in an increase in emergency room visits, emergency responses, and emergency medical technicians' administration of Narcan or naloxone."); *id.* ¶¶ 714–45 (recounting increases in rates of addiction, overdose, Hepatitis C, and NAS, then concluding that "[b]etween 2012 and 2016, Summit County estimates that it spent roughly $66 million on costs tied to the opioid crisis").

[17] *See, e.g.*, *McKinney v. Microsoft Corp.*, 2011 WL 13228141, at *6–7 (S.D. Ohio May 12, 2011) (dismissing common law negligence and breach of warranty claims as abrogated by the OPLA, even where the plaintiff solely alleged "economic damage [that was] insufficient to satisfy the 'harm' element under" the OPLA); *Chem. Solvents, Inc. v. Advantage Eng'g, Inc.*, 2011 WL 1326034, at *12–13 (N.D. Ohio Apr. 6, 2011) (dismissing plaintiff's implied warranty claim for purely economic damages as abrogated by the OPLA and rejecting plaintiff's argument that the OPLA "does not apply to these claims because it is only seeking economic damages"); *see also Leen v. Wright Med. Tech., Inc.*, 2015 WL 5545064, at *2 (S.D. Ohio Sept. 18, 2015) (dismissing unjust enrichment claim as abrogated).

R&R (at 79) erred in refusing to confront the key duty question head on, instead asserting that it cannot be decided "based upon the limited record before it."

What Distributors negligently failed to do, according to the County, is report or halt suspicious opioid orders.  *E.g.*, Compl. ¶ 579.[18]  But the R&R identified no Ohio case recognizing a common-law duty to report or halt suspicious orders of controlled substances.  The source of any such duty cannot be state or federal regulations regarding suspicious orders because the law is clear (and the County does not dispute) that those regulations do not give rise to a private right of action.  Opp. 74–75; Reply 25.

Even if there were a common-law duty to report or halt suspicious orders, no authority suggests that such a duty runs to cities or counties.  "Duty, as used in Ohio tort law, refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff."  *Wallace*, 773 N.E.2d at 1026.  Distributors purchase pharmaceuticals from manufacturers and sell them to licensed pharmacies. They have no relationship with the County.  *See Driessen v. Woodforest Nat. Bank*, 940 F. Supp. 2d 584, 590 (S.D. Ohio 2013) ("Plaintiff's lack of any account or relationship with [Defendant] as a customer inexorably leads to the conclusion that [Defendant] bore no duty of care to Plaintiff" under "Ohio tort law").

The R&R relies improperly on *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002).  The General Assembly effectively overruled *Beretta* when it amended the OPLA, and since that time, the Ohio Supreme Court has not cited *Beretta* for any substantive

---

[18]  Plaintiffs attempt to cast Distributors' alleged duty as a duty to use "reasonable care."  But the only failures of "reasonable care" identified anywhere in the Complaint or the R&R consist of Distributors' alleged failure to report or halt suspicious orders.

proposition.  The R&R never discusses whether *Beretta* has continuing vitality in light of the OPLA amendment, despite the fact that Distributors briefed that argument.  *E.g.*, Reply 27.[19]

## VI.    THE R&R'S ECONOMIC LOSS DOCTRINE ERROR.

The R&R erred in refusing to apply Ohio's economic loss doctrine.  The R&R (at 83) does not dispute that the doctrine "prohibits a negligence claim unless the plaintiff incurred a physical injury to person or property."  Instead, it asserts (at 84–85) that "it would be premature on this limited record to apply the economic-loss rule as Defendants have characterized Plaintiffs' economic damages as purely derivative of personal injuries."  This statement misunderstands the economic loss doctrine, which prohibits recovery for economic loss unless it arises from physical injury ***to the plaintiff's*** person or property.  *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 653 N.E.2d 661, 668–69 (Ohio 1995).  The County does not allege that it has suffered physical injury, and it may not recover for injuries to others.

The R&R, moreover, offers no cogent reason why discovery is necessary in order to dismiss a claim that, by its own terms, seeks to recover purely "economic damages."  Compl. ¶ 1062.  Nor does it explain why the negligence claim should not be dismissed under ***either*** the economic loss doctrine (to the extent it seeks to recover for economic injury) ***or*** the OPLA (to the extent it seeks to recover for personal injury).

---

[19]  Even if *Beretta* remains good law, it does not support the existence of a common-law duty owed to the County by Distributors.  The principal defendants in *Beretta* were 15 firearms manufacturers.  762 N.E.2d at 1140.  The opinion did not address the lone defendant distributor's duty.  The question presented was "whether a reasonably prudent gun manufacturer should have anticipated an injury to the Plaintiffs as a probable result of … a product with an alleged negligent design," *id.* at 1145, and the court held that it would have been feasible for manufactures to prevent "unauthorized users" from firing guns by incorporating certain safety features into the designs of their guns.  *Id.* at 1147 n.7.  Thus, at most, *Beretta* underscores the duties of manufacturers of hazardous products; it does nothing to establish any common-law duty owed by wholesale distributors.  In *Beretta*, moreover, the court applied a relaxed notice-pleading standard, and therefore the court's analysis and ultimate holding are irrelevant to whether Plaintiffs' Complaint is sufficient under the plausibility standard required by *Iqbal* and *Twombly*.

Dated:  November 2, 2018                     Respectfully submitted,


*/s/ Robert A. Nicholas*                     */s/ Enu Mainigi*
Robert A. Nicholas                           Enu Mainigi
Shannon E. McClure                           F. Lane Heard III
REED SMITH LLP                               Steven M. Pyser
Three Logan Square                           Ashley W. Hardin
1717 Arch Street, Suite 3100                 WILLIAMS & CONNOLLY LLP
Philadelphia, PA 19103                       725 Twelfth Street, NW
Tel: (215) 851-8100                          Washington, DC 20005
Fax: (215) 851-1420                          Tel: (202) 434-5000
rnicholas@reedsmith.com                      Fax: (202) 434-5029
smcclure@reedsmith.com                       EMainigi@wc.com
                                             lheard@wc.com
*Counsel for AmerisourceBergen Corporation*  spyser@wc.com
*and AmerisourceBergen Drug Corporation*     ahardin@wc.com


*/s/ Geoffrey E. Hobart*                      *Counsel for Cardinal Health, Inc.*
Geoffrey E. Hobart
Mark H. Lynch
Christian J. Pistilli
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street N.W.
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
cpistilli@cov.com


*Counsel for McKesson Corporation*

## LOCAL RULE 7.1(F) CERTIFICATION

Pursuant to the Court's October 10, 2018 order (Dkt. 1032), Distributors are permitted to file written objections of up to 15 pages to the Magistrate Judge's Report and Recommendation. These Objections adhere to that limit.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart

## CERTIFICATE OF SERVICE

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart