**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | )   **MDL 2804** |
| | ) |
| **THIS DOCUMENT RELATES TO:** | )   **Case No. 1:17-md-2804** |
| | ) |
| *The County of Summit, Ohio, et al. v.* | )   **Judge Dan Aaron Polster** |
| *Purdue Pharma L.P., et al.*, | ) |
| Case No. 18-op-45090 | )   **OPINION AND ORDER** |

This matter is before the Court upon the Report and Recommendation ("R&R") of the United States Magistrate Judge. **Doc. #: 1025** (hereinafter cited as "R&R"). On November 2, 2018 Manufacturer,[1] Distributor, and Retail Pharmacy Defendants and Plaintiffs all filed Objections to various portions of the R&R. Doc. ##: 1082, 1079, 1078, and 1080. On November 12, 2018 Plaintiffs and Defendants filed Responses to the Objections. Doc. ##: 1115 and 1116. Upon a *de novo* review of the record, and for the reasons set forth below, the Court **ADOPTS IN PART** and **REJECTS IN PART** the Report and Recommendation.

I.

The District Court reviews proper objections pursuant to its duty under Federal Rule of Civil Procedure 72(b). Fed. R. Civ. P. 72(b) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to.") In a footnote, Manufacturer Defendants purport to object to "the entirety of the R&R." Doc #: 1082 at n.1. This

---

[1] Defendant Noramco, Inc. states that it joined in Manufacturers' Motion to Dismiss "to the extent applicable," Doc. #: 499-1 at 1 n.2, and requests clarification that it is included among the moving Manufacturer Defendants and is entitled to all applicable relief. Doc. #: 1082 at 1 n.1. The Court clarifies that Noramco is included among the moving Manufacturer Defendants and is entitled to all applicable relief.

objection is not proper insofar as it does not include any bases in or support from legal authority. Therefore, as there are no proper objections to the facts or procedural history, the Court adopts the facts and procedural history as stated in the R&R. Further, there are no objections to the R&R with respect to the following sections:

- Section III.B. Preemption

- Section III.H. Count Eight: Fraud

- Section III.L. Statewide Concern Doctrine

- Section III.M. Article III Standing[2]

The Court presumes the parties are satisfied with these determinations and adopts the R&R with respect to these sections. "Any further review by this Court would be a duplicative and inefficient use of the Court's limited resources." *Graziano v. Nesco Serv. Co.*, No. 1:09 CV 2661, 2011 WL 1131557, at *1 (N.D. Ohio Mar. 29, 2011) (citing *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health and Human Services*, 932 F.2d 505 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981)).

## II.

As an initial matter, Retail Pharmacy Defendants have asked the Court to clarify that the claims brought against them are only brought in their capacity as distributors, not as dispensers. *See* Doc. #: 1078 at 2. The Court understands that Plaintiffs have disclaimed any cause of action against Retail Pharmacies in their capacity as retailers or dispensers of opioids, *see* Doc. #: 654 at 75 n.47, and thus considers the parties' arguments while keeping in mind that the Retail Pharmacies may only be held liable as distributors.

---

[2] Pharmacy Defendants, in their objections, mention Article III standing only briefly in a section dedicated to the RICO claims. *See* Doc. #: 1078 at 2-3. They mischaracterize the R&R's analysis of the Article III standing directness requirement, rehash arguments already made in their motion to dismiss, and then move on to address their RICO analysis concerns. The Court finds this objection without merit, and therefore it is overruled.

### A. Tolling of the Statute of Limitations

The R&R concluded that Plaintiffs have alleged sufficient facts "to raise a plausible inference that the applicable limitations periods are subject to tolling." R&R at 55-56. Manufacturer Defendants object, stating that Plaintiffs' Complaint indicates that they knew or should have known of both the Manufacturers' marketing practices and the costs Plaintiffs were incurring. Defendants argue that it follows that Plaintiffs, by their own allegations, did not act with sufficient diligence to support a fraudulent concealment theory. In addition to tolling under a fraudulent concealment theory, Plaintiffs also assert that the continuing violations doctrine should be applied to save their claims from the relevant statute of limitations.

### 1. Fraudulent Concealment

The R&R correctly states that "resolving a motion to dismiss based on statute-of-limitations grounds is appropriate when the undisputed facts 'conclusively establish' the defense as a matter of law." R&R at 54 (citing *Estate of Barney v. PNC Bank*, 714 F.3d 920, 926 (6th Cir. 2013); *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012), *cert. denied*, 568 U.S. 1157 (2013)). "In order for Plaintiff's delay in filing to be excused due to Defendants' fraudulent concealment, Plaintiff must affirmatively plead with particularity: '(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.'" *Reid v. Baker*, 499 F. App'x 520, 527 (6th Cir. 2012) (quoting *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir.1975)). However, as the R&R also points out, "courts should not dismiss complaints on statute-of-limitations grounds when there are disputed factual questions relating to the accrual date." *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 464 (6th Cir. 2016) (citing as examples of disputed factual questions, "claims that the defendant fraudulently concealed facts, thereby preventing the plaintiff

from learning of its injury . . . and complex issues about whether information in the plaintiff's possession sufficed to alert it of the claim").

Defendants' assertions that Plaintiffs were aware, at least since 2007, of their marketing practices and knew about the effects of the opioid crisis, effectively admitted in the Complaint,[3] are insufficient to *conclusively establish* that any of Plaintiffs' claims are time-barred by the statute of limitations. If Plaintiffs relied solely on Defendants' concealment of their marketing practices, Plaintiffs' assertion that the statutes of limitation were tolled due to fraudulent concealment would fail. However, Plaintiffs' allegations of fraudulent concealment do not rely solely on Defendants' alleged concealment of their marketing practices. Plaintiffs also allege that Defendants concealed their lack of cooperation with law enforcement and that they affirmatively misrepresented that they had satisfied their duty to report suspicious orders, concealing the fact that they had not done so. *See* Doc. #: 514 at 232-33 (hereinafter cited as "SAC").

Plaintiffs additionally point out that they could not have discovered "the nature, scope, and magnitude of Defendants' misconduct, and its full impact on Plaintiffs, and could not have acquired such knowledge earlier through the exercise of reasonable diligence," because until this Court ordered production of the ARCOS database in this litigation, Plaintiffs did not have access to that information. *Id.* at 233 (citing Doc. #: 233 at 6-7). Without access to the ARCOS data, Plaintiffs were forced to take Defendants at their word that they were complying with their obligations under consent decrees, statutes, and regulations. Plaintiffs inarguably knew about Defendants' marketing practices, but whether they had sufficient information, in the absence of

---

[3] *See, e.g.*, Doc. #: 514 at 238 ("In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risks of addiction."); *see also Id.* at 212 ("the increase in fatal overdoses from prescription opioids has been widely publicized for years.").

4

the ARCOS data, to identify Defendants' alleged concealment and thus the scope or magnitude of Defendants' alleged misconduct is a disputed factual question.

### 2. Continuing Violations

Plaintiffs also assert that the applicable statute of limitations should be tolled under the continuing violations doctrine. *Id.* at 231. In the Sixth Circuit, a "'continuous violation' exists if: (1) the defendants engage in continuing wrongful conduct; (2) injury to the plaintiffs accrues continuously; and (3) had the defendants at any time ceased their wrongful conduct, further injury would have been avoided." *Hensley v. City of Columbus*, 557 F.3d 693, 697 (6th Cir. 2009) (citing *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 521 (6th Cir.1997)). Although Ohio courts are generally reluctant to apply the doctrine outside the Title VII context, "this doctrine is rooted in general principles of common law and is independent of any specific action." *Id.* Further, the Sixth Circuit has noted that "no opinion has articulated a principled reason why the continuing-violation doctrine should be limited to claims for deprivations of civil rights and employment discrimination." *Nat'l Parks Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 480 F.3d 410, 416–17 (6th Cir. 2007). "Courts have allowed the statute of limitations to be tolled [under the continuing violations framework] when . . . there is a 'longstanding and demonstrable policy' of the forbidden activity." *Ohio Midland, Inc. v. Ohio Dep't of Transp*, 286 F. App'x 905, 912 (6th Cir. 2008) (citing *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 857 (6th Cir.2003).).

Here, taking the factual allegations in the Complaint as true, Plaintiffs have alleged a longstanding and demonstrable policy of misrepresentations and omissions on the part of Defendants sufficient to demonstrate their engagement in continuing wrongful conduct. In addition, whether further injury could have been avoided had Defendants ceased this conduct is another disputed factual question. Therefore, the Court finds that Plaintiffs have alleged facts sufficient to raise a plausible inference that the applicable limitations periods are subject to

tolling—under either a fraudulent concealment theory or a continuing violation theory—and that no claims should be dismissed on statute of limitations grounds at this early stage in the litigation.

### B. RICO

After a lengthy discussion of RICO, the R&R concluded that Plaintiffs' RICO claims should survive Defendants' motions to dismiss. R&R at 11-44. "RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime." *Sedima, SPRL v. Imrex Co., Inc.*, 473 U.S. 479, 498 (1985) (citing *Russello v. United States*, 464 U.S. 16, 26-29 (1983)). In *Sedima*, the Supreme Court acknowledged the Second Circuit's distress over the "extraordinary, if not outrageous," uses to which civil RICO claims had been applied. *Id.* at 499. "Instead of being used against mobsters and organized criminals, it had become a tool for everyday fraud cases brought against respected and legitimate enterprises." *Id.* However, in reversing the 2nd Circuit, the *Sedima* Court observed:

> . . . Congress wanted to reach both "legitimate" and "illegitimate" enterprises. *United States v. Turkette*, [452 U.S. 576 (1981)]. The former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences. The fact that § 1964(c) is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued. Nor does it reveal the "ambiguity" discovered by the court below. "[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Haroco, Inc. v. American National Bank & Trust Co. of Chicago*, [747 F.2d 384, 398 (1984)].

*Id.*

The RICO analysis is complicated because, "RICO's civil-suit provision imposes two distinct but overlapping limitations on claimants—standing and proximate cause . . . [a]nd as a matter of RICO law, the two concepts overlap." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 613 (6th Cir. 2004). Defendants object to the R&R's conclusions regarding both "overlapping" limitations. Regarding standing, Defendants argue that Plaintiffs' injuries are 1) not to Plaintiffs'

"business or property" as required by the statute, and 2) derivative of a third-party's injuries (i.e. not direct). Regarding proximate cause, Defendants argue that Plaintiffs' injuries are too remote to hold Defendants liable under RICO (i.e. not direct). Manufacturing Defendants succinctly summarize the way "directness" applies to RICO analysis.

> For standing to exist, an injury must be "direct" in the sense of being both (1) non-derivative of some third party's injury (***the standing analysis***), *see Trollinger*, 370 F.3d at 614; and (2) having an uninterrupted, direct, and not overly attenuated causal chain from conduct to injury (***the proximate cause analysis***), *see Anza*, 547 U.S. at 457.

Doc. #: 1082 at 3 (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)) (emphasis in original). "Because Congress modeled [the RICO] provision on similar language in the antitrust laws (§ 4 of the Clayton Act and § 7 the Sherman Act) and because the antitrust laws have been interpreted to require that a private plaintiff show proximate cause in order to have standing to sue, RICO civil claims also require proximate cause. *Trollinger*, 370 F.3d at 612 (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267-68 (1992); *Sedima*, 473 U.S. at 496). Thus, although standing is a threshold issue, because proximate cause analysis is necessarily incorporated within the standing analysis, the Court begins with proximate cause.

### 1. Proximate Cause

In *Holmes*, the Supreme Court described proximate cause as "the judicial tools used to limit a person's responsibility for the consequences of that person's own act," and further stated "the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'" 503 U.S. at 268 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984)). In a RICO claim, "[t]he proximate-cause inquiry . . . requires careful consideration of the 'relation between the injury asserted and the injurious conduct alleged.'" *Anza*, 547 U.S. at 462 (quoting *Holmes*, 503 U.S. at 268). "Though foreseeability is an element of the proximate cause analysis, it is distinct from the

requirement of a direct injury." *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 850 (6th Cir. 2003) (citing *Holmes*, 503 U.S. at 268-69.). Additionally, the *Holmes* Court provided several reasons why "some direct relation between the injury asserted and the injurious conduct alleged" is so important to the proximate cause analysis. *Holmes*, 503 U.S. at 268. The Court stated:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Id.* at 269–70 (internal citations omitted). Thus, it is important to first carefully consider the relationship between the injury asserted by Plaintiffs and the alleged injurious conduct of Defendants and then further consider whether that relationship implicates any of the concerns highlighted by the *Holmes* Court.

Plaintiffs allege that "RICO Marketing Defendants . . . conducted an association-in-fact enterprise . . . to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term chronic pain" thereby creating the opioid epidemic.[4] SAC at 270. Plaintiffs further allege that RICO Supply Chain Defendants . . . formed an association-in-fact enterprise . . . for the purpose of increasing the quota for and profiting from the increased volume of opioid sales in the United States" thereby creating the opioid epidemic.[5] It is important to note that Plaintiffs never expressly define what they mean by the term "opioid epidemic." The term

---

[4] According to the Complaint, the RICO Marketing Defendants are "Purdue, Cephalon, Janssen, Endo, and Mallinckrodt." *See* Doc. #: 514 at 270.

[5] According to the Complaint, the RICO Supply Chain Defendants are "Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen" *See* Doc. #:514 at 279.

may reasonably refer to the massive rate of addiction, overdose, and death associated with taking opioids. *See, e.g.*, *id.* at 214-15 ("Ohio is among the states hardest hit by the opioid epidemic. . . . Overdose deaths have become the leading cause of death for Ohioans under the age of 55.").

However, the term "opioid epidemic" may just as reasonably include black markets for diverted opioids. *See, e.g.*, *id.* at 284 ("[Defendants' violations] allowed the widespread diversion of prescription opioids out of appropriate medical channels and into the illicit drug market—causing the opioid epidemic."); *see also id.* at 7 ("The increased volume of opioid prescribing correlates directly to skyrocketing addiction, overdose and death [and] black markets for diverted prescription opioids.). Regarding their asserted injuries, however, Plaintiffs are more explicit. Plaintiffs expressly assert thirteen categories of damages. *See id.* at 285-86. Among these is, for example, the "costs associated with . . . attempts to stop the flow of opioids into local communities." *Id.*

Manufacturer Defendants argue that the chain of causation from conduct to injury is as follows:

> (i) a Manufacturer made deceptive claims in promoting its opioids (***the conduct***); (ii) some physicians were exposed to that Manufacturer's claims; (iii) which caused some of those physicians to write medically inappropriate opioid prescriptions they would not have otherwise written; (iv) which caused some of their patients to decide to take opioids; (v) which caused some of those individuals to become addicted to opioids; (vi) which caused some of those addicted individuals to need additional medical treatment, to neglect or abuse their families, to lose their jobs, and/or to commit crimes; (vii) which caused Plaintiffs to expend additional resources on emergency services, and to lose revenue from a decreased working population and/or diminished property values (***the injury***).

Doc. #: 1082 at 9-10 (emphasis in original). However, Plaintiffs have alleged sufficient facts to support a far more direct chain of causation: (i) RICO Marketing Defendants made deceptive claims in promoting their opioids in order to sell more opioids than the legitimate medical market could support (***the conduct***); (ii) the excess opioids marketed by the RICO Marketing Defendants

9

and distributed by the RICO Supply Chain Defendants were then diverted into an illicit, black market; (iii) Plaintiffs were forced to expend resources beyond what they had budgeted to attempt to stop the flow of the excess opioids into local communities and to bear the costs associated with cleaning them up. Under this potential chain of causation, the relationship between Plaintiffs' injury and Defendants' alleged conduct is less remote than prior Sixth Circuit precedent finding proximate cause, and is not too remote to support a finding of proximate cause here. *See, e.g.*, *Trollinger*, 370 F.3d at 619 (finding proximate cause where Tyson "hired sufficient numbers of illegal aliens to impact the legal employees' wages," having an "impact on the bargained-for wage-scale," which "allowed Tyson not to compete with other businesses for unskilled labor," and finally where "Tyson's legal workers did not 'choose' to remain at Tyson for less money than other businesses offered").

Thus, it is incumbent upon the Court to consider whether any of the *Holmes* Court's reasons for requiring directness are implicated. Here, Plaintiffs' alleged damages are not speculative, but concrete and ascertainable. No other party can vindicate the law and deter Defendants' alleged conduct because Plaintiffs' asserted damages are not recoverable by any other party. Finally, there is no potential for—and thus no reason for the Court to have to adopt complicated rules to prevent—duplicative recoveries. As none of the *Holmes* concerns are implicated in this case, the Court finds that Plaintiffs have sufficiently alleged proximate cause for their RICO claims.

### 2. Standing

Having determined that Plaintiffs have alleged sufficient facts to find that they do not stand at too remote a distance to recover, the Court now turns to standing. Title 18 of the U.S. Code, section 1964(c), has been deemed the standing provision of RICO. It provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor . . . and shall recover threefold the damages he sustains and the cost of the suit, including

reasonable attorney's fee." 18 U.S.C. § 1964(c). The two operative portions of this section are the "business or property" limitation and the "by reason of" limitation.

"The 'by reason of' limitation . . . bundles together a variety of 'judicial tools,' some of which are traditionally employed to decide causation questions and some of which are employed to decide standing questions." *Trollinger*, 370 F.3d at 613 (citing *Holmes*, 503 U.S. at 268.). As it pertains to standing, the "by reason of" limitation is used to analyze whether a plaintiff is asserting an injury that was borne directly by that plaintiff or whether the injury was "derivative or passed-on" to the plaintiff by some intermediate party. *See id.* at 614.

### a. The "by reason of" Limitation (Direct Versus Passed-On Injury)

Defendants claim that Plaintiffs' asserted injuries are "necessarily derivative of harms to individual opioid users." Doc. #: 1082 at 4. They state that "it is the opioid user who (if anyone) was directly harmed, and it is only as a result of this harm—in the aggregate—that Plaintiffs can claim to have experienced additional public expenditures, lost tax revenue, and diminished property values." *Id.* Defendants cite *Perry* as a paradigmatic example from the Sixth Circuit of the distinction between derivative and non-derivative injuries. Defendants characterize *Perry* as follows: "Plaintiffs [in *Perry*] were individual insurance plan subscribers who alleged that because of the tobacco manufacturers' conduct, they paid increased premiums to account for medical care provided to smokers in the same insurance pool." *Id.* at 4-5 (citing *Perry*, 324 F.3d at 847) (internal citations omitted).

Defendants' characterization of *Perry* is correct, but *Perry* is factually distinct from this case. In *Perry*, tobacco users suffered smoking-related injuries which increased healthcare costs. That is where the similarities with the present case end. In *Perry*, the increased healthcare costs were borne by insurance companies who then passed-on those costs to individual insurance plan subscribers in the form of higher insurance premiums. The non-smoking individual subscribers

11

then sued the tobacco companies for the costs passed-on to them by the insurance companies. *See Perry*, 324 F.3d at 847. Thus, *Perry* represents a classic case of "passed-on" economic injury. Here, as described above, Plaintiffs have alleged a plausible claim that their injuries are the direct result of Defendants' creation of an illicit opioid market within their communities.[6] Plaintiffs' asserted economic injuries are borne by them and not passed-on by any intermediate party standing less removed from Defendants' actions.

The tobacco cases, in general, are factually distinct from the present case for an additional reason. In the tobacco cases, no one asserted, nor could they have, that tobacco defendants created an "illicit cigarette market" the attendant consequences of which might have caused the government plaintiffs to expend their limited financial resources to mitigate. This "opioid epidemic as an illicit market" concept is an important distinction underlying many of Plaintiffs' allegations. *See, e.g.*, SAC at 150-51. Therefore, assuming as it must that Plaintiffs can prove their allegations, the Court finds it plausible that Plaintiffs' asserted injuries were directly caused "by reason of" Defendants' injurious conduct.

### b. The "business or property" Limitation

Even if Plaintiffs' asserted injuries were proximately and directly caused "by reason of" Defendants' alleged injurious conduct, Plaintiffs still may not bring a RICO claim if the injuries asserted were not to their "business or property." 18 U.S.C. § 1964(c). As a general principal, "money, of course, is a form of property." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979). It is also true that, "[a] person whose property is diminished by a payment of money wrongfully

---

[6] Plaintiffs allege that "Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market.. . . All registrants—which includes all manufacturers and distributors of controlled substances—must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion." Doc. #: 514 at 150-51 (citing 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74).

induced is injured in his property." *County of Oakland v. City of Detroit*, 866 F.2d 839, 845 (6th Cir. 1989) (quoting *Chattanooga Foundry and Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906)). Plaintiffs assert thirteen categories of expenditures that they contend represent a substantial monetary loss, and are therefore an injury to their property. *See* SAC at 285. Defendants contend that none of the monetary costs asserted by Plaintiffs are the type of property injury anticipated (and thus permitted) by the RICO statute.

### (i) Personal Injuries

The Sixth Circuit has held that "personal injuries and pecuniary losses flowing from those personal injuries fail to confer relief under § 1964(c)." *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 565-66 (6th Cir. 2013). "Courts interpreting RICO have remained faithful to this distinction [between non-redressable personal injury and redressable injury to property] by excluding damages '*arising directly out of*' a personal injury, even though personal injuries often lead to monetary damages that would be sufficient to establish standing if the plaintiff alleged a non-personal injury." *Id.* (emphasis added).

The *Jackson* court's holding that RICO claims that allege damages "arising directly out of a personal injury" are not redressable adds another layer to the "directness" requirement summarized by Defendants above. As stated previously, Defendants explained two ways in which RICO allegations must be sufficiently direct to maintain a RICO claim. First, the relationship between the asserted injury and the alleged injurious conduct must have a *direct* causal connection. (the proximate cause analysis). And second, the asserted injury must also be borne *directly* by Plaintiffs and not passed-on to them by intermediate parties (the standing "by reason of" analysis). Under *Jackson*, there is an additional element of *directness* to consider—whether Plaintiffs' alleged injury arises *directly* out of a personal injury. While the first two analyses require closeness

13

of the relationship between injury and injurious conduct, the *Jackson* analysis requires separation between personal injury and pecuniary losses that arise therefrom.

To determine what type of pecuniary losses arise directly out of personal injury, the Court first looks to the facts of *Jackson* itself. In *Jackson*, former employees who suffered personal injuries at work sued their employer for a RICO violation. They alleged that their employer's workers' compensation administrator and physician engaged in a fraudulent scheme to avoid paying workers' compensation benefits to them, causing them to suffer monetary losses (i.e. receiving less money from their personal injury claim than they felt they were entitled to). *See id.* at 561-62. The *Jackson* court rejected the plaintiffs' theory that their workers' compensation benefits created an intervening legal entitlement to money, which is property under RICO. *See id.* at 566. The *Jackson* court also cites several examples where other circuits have considered when a pecuniary harm arises directly out of a personal injury. *See, e.g.*, *id.* at 564 n.4. Reviewing these cases, the Court determines that their unifying character is that pecuniary losses "arise directly out of" a personal injury when the alleged RICO injury merely acts as an alternate theory for recovering damages otherwise available in a tort claim for personal injury and is asserted by the plaintiff him- or herself.[7]

In other words, damages that result from a personal injury to a plaintiff (such as attorney fees, lost wages, lost workers' compensation benefits, or medical expenses), that are recoverable

---

[7] Footnote 4 of the *Jackson* opinion cites the following exemplary cases: *Evans v. City of Chicago*, 434 F.3d 916 (7th Cir.2006) (false imprisonment causing loss of income not an injury to "business or property"); *Diaz v. Gates*, 420 F.3d 897 (9th Cir.2005) (*en banc*) (false imprisonment causing loss of employment and employment opportunity *is* an injury to "business or property"); *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417 (5th Cir.2001) (assault claim against tobacco company causing wrongful death of smoker not an injury to "business or property"); *Hamm v. Rhone–Poulenc Rorer Pharm., Inc.*, 187 F.3d 941 (8th Cir.1999) (retaliatory firing causing damage to reputation not an injury to "business or property"); *Bast v. Cohen, Dunn & Sinclair, PC*, 59 F.3d 492, 495 (4th Cir.1995) (surreptitiously recorded phone calls causing mental anguish not an injury to "business or property"); *Doe v. Roe*, 958 F.2d 763 (7th Cir.1992) (coercion into sexual relationship by attorney causing emotional harm not an injury to "business or property"); *Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 644 (6th Cir.1986) (exposure to toxic chemicals during employment with defendant causing personal injuries not an injury to "business or property").

in a typical tort action are not recoverable in RICO, even if caused by a defendant's racketeering activity. These are costs that arise directly out of the plaintiff's personal injury, and are not injuries to plaintiff's "business or property" under the statute.

Defendants contend that Plaintiffs are attempting to recover the pecuniary losses resulting directly from their addicted residents' physical injuries, citing *Jackson*. Plaintiffs respond that their economic losses are not pecuniary losses resulting from their addicted residents' personal injuries; rather, they are concrete economic losses to the cities and counties resulting directly from Defendants' relinquishment of their responsibility to maintain effective controls against diversion of Schedule II narcotics. *See, e.g.*, 21 U.S.C. § 823(a)-(b).

Plaintiffs have the better argument. None of Plaintiffs' thirteen categories of costs arise directly out of a personal injury to Plaintiffs themselves. *See* Doc. #: 654 at 36-37 ("Plaintiffs' damages claims are not for personal injuries, but police and fire services, lost taxes, revenue and funding."). Even if *Jackson* can be read to preclude a RICO claim by a plaintiff who is tasked to protect the well-being of a third-party where the asserted economic harm is created by a personal injury to that third-party, it still does not follow that all thirteen categories of damages asserted by Plaintiffs arise directly out of such personal injuries. In that scenario, it would still be crucial to determine whether Plaintiffs' alleged injuries result directly from the personal injuries sustained by their citizens.

Plaintiffs assert the following injuries:

a. Losses caused by the decrease in funding available for Plaintiffs' public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic;

b. Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

c. Costs of training emergency and/or first responders in the proper treatment of drug overdoses;

d. Costs associated with providing police officers, firefighters, and emergency and/or first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

e. Costs associated with emergency responses by police officers, firefighters, and emergency and/or first responders to opioid overdoses;

f. Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

g. Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

h. Costs associated with law enforcement and public safety relating to the opioid epidemic, including but not limited to attempts to stop the flow of opioids into local communities, to arrest and prosecute street-level dealers, to prevent the current opioid epidemic from spreading and worsening, and to deal with the increased levels of crimes that have directly resulted from the increased homeless and drug-addicted population;

i. Costs associated with increased burden on Plaintiffs' judicial systems, including increased security, increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction;

j. Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

k. Loss of tax revenue due to the decreased efficiency and size of the working population in Plaintiffs' communities;

l. Losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root; and

m. Losses caused by diminished property values in the form of decreased business investment and tax revenue.

SAC at 285-286. Perhaps it can be said that items b and e above (the provision of medical treatment and emergency response services) arise directly out of the personal injury of the citizens because they are effectively claims to recoup the costs of medical expenses. However, there are other categories of costs, for example item h (the costs associated with "attempts to stop the flow of

opioids into [Plaintiffs'] communities . . . [and] prevent the current opioid epidemic from spreading and worsening"), that cannot be said to arise directly out of Plaintiffs' residents' personal injuries. *Id.* Thus, under no reading of *Jackson* can it be maintained that *all* of Plaintiffs' asserted injuries arise directly out of a personal injury, and it is more likely, in this Court's opinion, that most do not.

### (ii) Sovereign Capacity

Finally, Defendants argue that regardless of the above, Plaintiffs cannot recover injury to their property to the extent they seek to recover costs associated with services provided in Plaintiffs' sovereign or quasi-sovereign capacities, which Defendants argue, accounts for the entirety of Plaintiffs' claimed injuries. Doc. #: 1082 at 6-7. Defendants implore the Court to follow the Ninth Circuit's holding in *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008). Defendants claim that *Canyon County's* holding that "money 'expended on public health care and law enforcement services' by a city or county does not constitute injury to 'business or property' under RICO" is applicable to the present case. *See* Doc. #: 1079 at 6 (quoting *Canyon County*, 519 F.3d at 971). Defendants point out that the Sixth Circuit has previously relied on *Canyon County* (albeit for its analysis of the proximate cause requirement of RICO and not for its "business or property" analysis) in *City of Cleveland v. Ameriquest Mort. Sec., Inc.*, 615 F.3d 496 (6th Cir. 2010). The R&R declined to follow *Canyon County*, however, stating that, "Defendants . . . have not identified any Supreme Court or Sixth Circuit case directly on point with the facts of this case."

The R&R is correct because there has never been a case with facts analogous to those alleged by Plaintiffs here. It cannot be stressed strongly enough that the prescription opiates at

issue in this case *are Schedule II controlled substances*.[8] Plaintiffs have alleged a wanton disregard for public health and safety exhibited by Defendants with respect to their legal duty to try to prevent the diversion of prescription opioids. With the privilege of lawfully manufacturing and distributing Schedule II narcotics—and thus enjoying the profits therefrom—comes the obligation to monitor, report, and prevent downstream diversion of those drugs. *See* 21 U.S.C. § 823(a)-(b). Plaintiffs allege that Defendants have intentionally turned a blind eye to orders of opiates they knew were suspicious, thereby flooding the legitimate medical market and creating a secondary "black" market at great profit to Defendants and at great cost to Plaintiffs.[9] Plaintiffs must shoulder the responsibility for attempting to clean up the mess allegedly created by Defendants' misconduct.

In *Canyon County*, the County brought a RICO claim against four defendant companies for "knowingly employ[ing] and/or harbor[ing] large numbers of illegal immigrants within Canyon County, in an 'Illegal Immigrant Hiring Scheme.'" *Canyon County*, 519 F.3d at 972. The County claimed that it "paid millions of dollars for health care services and criminal justice services for the illegal immigrants who [were] employed by the defendants in violation of federal law." *Id.* Based on these facts, the Ninth Circuit concluded that "when a governmental body acts in its sovereign or quasi-sovereign capacity, seeking to enforce the laws or promote the public well-

---

[8] "Since passage of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 *et seq.* ("CSA" or "Controlled Substances Act"), opioids have been regulated as controlled substances. As controlled substances, they are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the most dangerous. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally had been categorized as Schedule II or Schedule III drugs; hydrocodone and tapentadol were recently reclassified from Schedule III to Schedule II. Schedule II drugs have a high potential for abuse, and may lead to severe psychological or physical dependence. Schedule III drugs are deemed to have a lower potential for abuse, but their abuse still may lead to moderate or low physical dependence or high psychological dependence." SAC at 16 n.5.
[9] For example, Plaintiffs allege that "between 2012 and 2016, Summit County estimates that it spent roughly $66 million on costs tied to the opioid crisis. Those costs are projected to add up to another $89 million over the next five years, representing a total cost to the County of $155 million over the ten year period "simply trying to keep up with the epidemic.'" Doc. #: 514 at 226.

being, it cannot claim to have been 'injured in [its] . . . property' for RICO purposes based *solely* on the fact that it has spent money in order to act governmentally." *Canyon County*, 519 F.3d at 976 (emphasis added). As stated above, neither the Sixth Circuit nor the Supreme Court have adopted the holding in *Canyon County*, and certainly not for the broad proposition that governmental entities are *barred* from seeking RICO claims for services provided in their sovereign or quasi-sovereign capacities. Not even *Canyon County* established such a bright-line rule. The *Canyon County* court held that governmental entities are not injured in their property based *solely* on the expenditure of money to act governmentally. Use of the word "solely" implies that governmental entities might be able to assert an injury to their property based on the expenditure of money plus something else, perhaps, for example, the assumption of a statutory burden relinquished by a defendant.

In this case, the scope and magnitude of the opioid crisis—the illicit drug market and attendant human suffering—allegedly created by Defendants have forced Plaintiffs to go far beyond what a governmental entity might ordinarily be expected to pay to enforce the laws or promote the general welfare. Plaintiffs have been forced to expend vast sums of money far exceeding their budgets to attempt to combat the opioid epidemic. The Court thus concludes that while Cities and Counties cannot recover ordinary costs of services provided in their capacity as a sovereign, Cities and Counties should be able to recover costs greatly in excess of the norm, so long as they can prove the costs were incurred due to Defendants' alleged RICO violations.

Additionally, the Ninth Circuit held in *Canyon County* that governmental entities can, in fact, recover in RICO for the costs associated with doing business in the marketplace. *See, e.g.*, *id.* ("government entities that have been overcharged in commercial transactions and thus deprived of their money can claim injury to their property.").

19

It is Defendants' position that *all* of Plaintiffs' costs responding to Defendants' alleged misconduct are sovereign or quasi-sovereign public services derivative of their residents' opioid problems, for which they cannot recover. *See* Doc. #: 1082 at 7. The Court disagrees. Certainly, some of Plaintiffs' alleged costs are costs associated with the ordinary provision of services to their constituents in their capacity as sovereigns. *See, e.g.*, SAC at 285 (asserting injury due to the provision of emergency first responder services). These costs cannot be recovered unless Plaintiffs can prove they go beyond the ordinary provision of those services. However, some of Plaintiffs' alleged costs are clearly associated with Plaintiffs' *participation in the marketplace*, and for those costs, Plaintiffs can undoubtedly recover. *See, e.g.*, *id.* (asserting injury due to the costs associated with purchasing naloxone to prevent future fatal overdoses).

Therefore, under the broadest reading of Sixth Circuit precedent, the Court finds that Plaintiffs may recover damages based on the provision of governmental services in their capacity as a sovereign to the extent they can prove the asserted costs go beyond the ordinary cost of providing those services and are attributable to the alleged injurious conduct of Defendants. Under a more restrictive reading of *Jackson*, Plaintiffs still may recover those costs associated with preventing the flood of these narcotics into their communities, which do not directly arise from the personal injuries of their citizens (e.g. providing medical care, addiction treatment, etc.). Lastly, Plaintiffs have sufficiently alleged that at least some of their claimed injuries are recoverable under RICO due to Plaintiffs' participation in the marketplace. Thus, the Court concludes that it is not appropriate to dismiss the RICO claims at this early stage in the litigation.

### C. Civil Conspiracy

The R&R concluded that Plaintiffs sufficiently pled a claim for civil conspiracy. R&R at 95-98. Distributor Defendants object, stating that the Complaint "alleges no facts to support the assertion that Distributors participated in the marketing of opioids [or] . . . in applying or lobbying

20

for increased opioid production quotas from DEA, . . . [and] no facts to support the claim that Distributors conspired not to report the unlawful distribution practices of their competitors to the authorities." Doc. #: 1079 at 2-3 (emphasis removed). Pharmacy Defendants also object, arguing that to the extent a civil conspiracy is alleged through Defendants' participation in industry groups, the Complaint is deficient with respect to the Retail Pharmacies, because it does not allege their participation in those groups.

The R&R correctly identifies the elements of a cognizable conspiracy claim as: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy") *Hale v. Enerco Grp., Inc.*, 2011 WL 49545, at *5 (N.D. Ohio Jan. 5, 2011) (citation and internal quotation marks omitted). Distributor Defendants take exception to the R&R's finding of independent unlawful acts. Pharmacy Defendants object to the R&R's finding of a malicious combination. Defendants miss the forest for the trees.

Distributor Defendants characterize the R&R's finding of unlawful acts as "(1) fraudulently marketing opioids; (2) fraudulently increasing the supply of opioids by seeking increased quotas; and (3) failing to report suspicious orders." Doc #: 1079 at 2. This mischaracterizes the R&R's actual finding that "the statutory public nuisance, Ohio RICO, and injury through criminal acts claims" would all suffice to "fulfill the underlying unlawful act element." R&R at 96. The Court agrees that any of these claims is sufficient to satisfy the underlying unlawful act element.

Pharmacy Defendants assert that, because the Complaint fails to expressly allege their participation in industry groups such as the Healthcare Distribution Alliance and Pain Care Forum, that Plaintiffs failed to adequately plead a civil conspiracy claim, at least regarding them. However,

21

the R&R did not rely on industry group participation to find a malicious combination. The R&R concluded that:

> Pleading the existence of a malicious conspiracy requires "only a common understanding or design, even if tacit, to commit an unlawful act." *Gosden v. Louis*, 687 N.E.2d 481, 496-98 (Ohio Ct. App. 1996). "All that must be shown is that . . . the alleged coconspirator shared in the general conspiratorial objective." *Aetna Cas. & Sur. Co. v. Leahey Const. Co., Inc.*, 219 F.3d 519, 538 (6th Cir. 2000) (citation and internal quotation marks omitted).

*Id.* at 97. In other words, the R&R concluded that even absent evidence of participation in industry groups, alleging a "shared conspiratorial objective" is sufficient to demonstrate a "malicious combination" and thus survive Pharmacy Defendants' motion to dismiss. Plaintiffs allege "*all Defendants* took advantage of the industry structure, including end-running its internal checks and balances, to their collective advantage." SAC at 229 (emphasis added). Additionally, with respect to Retail Pharmacy Defendants specifically, Plaintiffs assert, "instead of taking any meaningful action to stem the flow of opioids into communities, they continued to participate in the oversupply and profit from it." *Id.* at 184. Thus, the R&R concluded, and this Court agrees, that Plaintiffs adequately pled that Defendants shared a general conspiratorial objective of expanding the opioid market and that there was a common understanding between all Defendants to disregard drug reporting obligations to effectuate that goal. Therefore, the Court adopts the R&R with respect to section III.K.

### D. Abrogation of Common Law Claims Under the Ohio Products Liability Act

The R&R concluded that Plaintiffs' Statutory Public Nuisance and Negligence Claims are not abrogated by the Ohio Product Liability Act ("OPLA").[10] R&R at 58-60, 61-62. As further

---

[10] Pharmacy Defendants argue, without any legal analysis, that Plaintiffs' Unjust Enrichment Claim is abrogated by the OPLA. Doc. #: 1078 at 11. The R&R does not address whether Plaintiffs' Unjust Enrichment Claim is abrogated by the OPLA, likely because the Pharmacies merely made a similarly undeveloped argument in their motion to dismiss, and only rehash them here. Due to the conspicuous lack of legal development in either Pharmacy Defendants' Motion to Dismiss or Objections to the R&R, the Court finds this objection improper. Regardless, per the analysis below, the Court finds that Plaintiffs' Unjust Enrichment Claim is not abrogated by the OPLA.

22

discussed below, the Court concurs with and adopts the R&R's recommendation and reasoning with respect to these findings. However, the R&R also concluded that Plaintiffs' Common Law Absolute Public Nuisance Claim is abrogated by the OPLA. *Id.* at 62-65. The Court disagrees.

### 1. Abrogation of the Common Law Public Nuisance Claims

The Ohio Product Liability Act, Ohio Rev. Code § 2307.71 *et seq.*, was enacted in 1988. It was amended in 2005 and amended again in 2007. Despite the General Assembly's attempts to clarify the language and intent of the statute's definition of "product liability claim," the Court finds that the definition remains ambiguous, and thus reviews the legislative history pursuant to Ohio Rev. Code § 1.49(C) ("If a statute is ambiguous, the court, in determining the intention of the legislature, may consider among other matters: . . . The legislative history.").

The OPLA, at the time of its enactment, did not explicitly state that it was intended to supersede all common law theories of product liability. It was also ambiguous regarding whether it superseded common law claims seeking only economic loss damages. The Ohio Supreme Court attempted to clarify these ambiguities in two cases, *Carrel v. Allied Prods. Corp.*, 677 N.E.2d 795, 799 (1997) (holding that "the common-law action of negligent design survives the enactment of the Ohio Products Liability Act.") and *LaPuma v. Collinwood Concrete*, 661 N.E.2d 714, 716 (Ohio 1996) (holding that "although a cause of action may concern a product, it is not a product liability claim within the purview of Ohio's product liability statutes unless it alleges damages other than economic ones, and that a failure to allege other than economic damages does not destroy the claim, but rather removes it from the purview of those statutes.").

In 2005, the General Assembly added the following provision to the OPLA ("the 2005 Amendment"): "Sections 2307.71 to 2307.80 of the Revised Code are intended to abrogate all common law product liability causes of action." 2004 Ohio Laws File 144 (Am. Sub. S.B. 80)

23

(codified at Ohio Rev. Code § 2307.71(B)). The associated legislative history of the 2005 Amendment states:

> The General Assembly declares its intent that the amendment made by this act to section 2307.71 of the Revised Code is ***intended to supersede the holding of the Ohio Supreme Court in Carrel v. Allied Products Corp.*** (1997), 78 Ohio St.3d 284, that the common law product liability cause of action of negligent design survives the enactment of the Ohio Product Liability Act, sections 2307.71 to 2307.80 of the Revised Code, and to abrogate all common law product liability causes of action.

*Id.* (emphasis added). Notably, the General Assembly cited the *Carrel* holding while conspicuously omitting the contemporary *LaPuma* holding. The Court therefore interprets the General Assembly's inclusion of *Carrel* to imply the intentional exclusion and therefore the tacit acceptance of the Ohio Supreme Court's holding in *LaPuma*.

In 2007, the Ohio Legislature further amended section 2307.71(A)(13) of the OPLA ("the 2007 Amendment") to add the following to the definition of "product liability claim:"

> "Product liability claim" ***also includes*** any public nuisance claim or cause of action at common law in which it is alleged that the design, manufacture, supply, marketing, distribution, promotion, advertising, labeling, or sale of a product unreasonably interferes with a right common to the general public.

2006 Ohio Laws File 198 (Am. Sub. S.B. 117) (emphasis added). The associated legislative history of the 2007 Amendment further states:

> The General Assembly declares its intent that the amendments made by this act to sections 2307.71 and 2307.73 of the Revised Code are ***not intended to be substantive but are intended to clarify the General Assembly's original intent*** in enacting the Ohio Product Liability Act, sections 2307.71 to 2307.80 of the Revised Code, as initially expressed in Section 3 of Am. Sub. S.B. 80 of the 125th General Assembly, to abrogate all common law product liability causes of action ***including*** common law public nuisance causes of action, regardless of how the claim is described, styled, captioned, characterized, or designated, including claims against a manufacturer or supplier for a public nuisance allegedly caused by a manufacturer's or supplier's product.

*Id.* (emphasis added). Senate Bill 80 of the 125th General Assembly (the 2005 Amendment) was a "tort reform" bill that was enacted to create limitations on various types of non-economic

24

damages. *See* 2004 Ohio Laws File 144 (Am. Sub. S.B. 80). Both the 2005 and 2007 Amendments demonstrate the General Assembly's intent to limit non-economic damages on all common law theories of product liability regardless of how the claim was characterized.

Throughout these amendments, however, the overarching substantive definition of a "product liability claim" has not changed much from the original 1988 OPLA definition. To fall within the statute's definition a plaintiff's product liability claim must 1) seek to recover compensatory damages 2) for death, physical injury to a person, emotional distress, or physical damage to property other than the product in question (*i.e.* "harm" as defined by the statute).[11] The subsequent amendments make clear that any civil action concerning liability for a product due to a defect in design, warning, or conformity—including any common law public nuisance or common law negligence claim, regardless of how styled—that 1) seeks to recover compensatory damages 2) for "harm" is abrogated by the OPLA. Conversely, a claim *not* seeking to recover compensatory damages or seeking to recover solely for "economic loss" (*i.e. not* "harm") does not meet the definition of a product liability claim and is not abrogated by the OPLA. The OPLA is explicit that "Harm is not 'economic loss,'" and "Economic Loss is not 'harm.'" Ohio Rev. Code § 2307.71(A)(2) and (7). This reading of § 2307.71(A)(13) is consistent with the legislative intent, the holding in *LaPuma*, and with § 2307.72(C) which states:

> Any recovery of compensatory damages for economic loss based on a claim that is asserted in a civil action, other than a product liability claim, is not subject to sections 2307.71 to 2307.79 of the Revised Code, but may occur under the common law of this state or other applicable sections of the Revised Code.

Ohio Rev. Code § 2307.72(C).

---

[11] Section 2307.71(A)(13) of the OPLA also requires that the claim allegedly arise from any of:
  (a)  The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;
  (b)  Any warning or instruction, or lack of warning or instruction, associated with that product;
  (c)  Any failure of that product to conform to any relevant representation or warranty.
Ohio Rev. Code § 2307.71(A)(13).

Further, by defining a "product liability claim" in terms of damages, the OPLA does not provide for any form of equitable remedy.[12] To conclude that all public nuisance claims, including those seeking equitable remedies, are subsumed by the OPLA would effectively be a substantive change in the law in contravention of the General Assembly's express intent that the amendment *not* be substantive. In other words, if all public nuisance claims, including those only seeking equitable relief, were abrogated by the OPLA, a party merely seeking an equitable remedy to stop a public nuisance would be forced instead to sue for compensatory damages under the OPLA, a result that appears completely at odds with the legislative intent to limit non-economic compensatory damages. Therefore, a claim seeking only equitable relief is not abrogated by the OPLA.

The R&R concluded that the 2007 Amendment added public nuisance claims as a second category of actions that fall under the definition of a product liability claim. *See* R&R at 58 n.37. In support of this conclusion, Defendants cite *Mount Lemmon Fire Dist. v. Guido*, 139 S. Ct. 22 (2018). *See* Doc. #: 1116 at 3. In *Mount Lemmon*, the Supreme Court interpreted Congress' addition of a second sentence to the definition of "employer" under the ADEA.[13] The Supreme Court held that the phrase "also means" adds a new category of employers to the ADEA's reach. *Mount Lemmon* is factually inapposite, and the R&R's conclusion is incorrect for two reasons. First, there is a substantive difference between the phrases "also means" and "also includes." The term "means" is definitional, while "the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle." *In re Hartman*, 443 N.E.2d

---

[12] Defendants identify section 2307.72(D)(1) as expressly carving out abatement relief for contamination of the environment as an indication that the OPLA supersedes all other forms of equitable relief. *See* Doc. #: 1116 at 4. However, a far more natural reading of this section is the carving out of all forms of relief for pollution of the environment from preemption by federal environmental protection laws and regulations.

[13] Under the ADEA, "the term 'employer' means a person engaged in an industry affecting commerce who has twenty or more employees . . . . The term *also means* (1) any agent of such a person, and (2) a State or political subdivision of a State . . . ." 29 U.S.C. § 630(b) (emphasis added).

516, 517–18 (Ohio 1983) (quoting *Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941)). In this case, the general principal is that to be a product liability claim, a plaintiff's cause of action must seek compensatory damages for harm. Thus, a public nuisance claim—to be "also include[d]" as a "product liability claim" under the OPLA—must likewise seek compensatory damages for harm. Ohio Rev. Code § 2307.71(A)(13).

Second, as the *Mount Lemmon* opinion points out, "Congress amended the ADEA to cover state and local governments." *Mount Lemmon*, 139 S. Ct. at 23. This amendment to the ADEA certainly amounts to—and was intended to be—an intentional, substantive change in the law. As highlighted above, however, the 2007 Amendment to the OPLA was not intended to be a substantive change.

Therefore, in light of the legislative history, the Court finds it at least plausible, if not likely, that the 2005 and 2007 Amendments to the OPLA intended to clarify the definition of "product liability claim" to mean "a claim or cause of action [*including* any common law negligence or public nuisance theory of product liability . . .] that is asserted in a civil action . . . that seeks to recover compensatory damages . . . for [harm] . . . ." This definition is the most consistent with the statute, the legislative history, and the caselaw. *See LaPuma v. Collinwood Concrete*, 661 N.E.2d 714, 716 (Ohio 1996) ("Failure to allege other than economic damages . . . removes it from the purview of [the OPLA].") (intentionally not overruled by the 125th General Assembly); *Volovetz v. Tremco Barrier Sols., Inc.*, 74 N.E.3d 743, 753 n.4 (Ohio Ct. App. Nov. 16, 2016) ("We recognize that a claim for purely economic loss is not included in the statutory definition of 'product liability claim,' and, consequently, a plaintiff with such a claim may pursue a common-law remedy."); *Ohio v. Purdue Pharma,* Case No. 17 CI 261 (Ohio C.P. Aug. 22, 2018) (finding that the Plaintiff's common law nuisance claim not seeking compensatory damages is not

abrogated under the OPLA.); *see also*, 76 Ohio Jur. 3d Claims Within Scope of Product Liability Act § 1 ("Ohio's products liability statutes, by their plain language, neither cover nor abolish claims for purely economic loss caused by defective products.").

Using this definition, Plaintiffs' absolute public nuisance claim, at least insofar as it does not seek damages for harm,[14] is not abrogated by the OPLA. Section III.E of the R&R is rejected to the extent it held that Plaintiffs' absolute public nuisance claim is abrogated by the OPLA.

### 2. City of Akron's Ability to Bring a Statutory Public Nuisance Claim

The R&R concluded that Plaintiffs' statutory public nuisance claim was not abrogated. R&R at 62. No party objected to this conclusion, therefore the Court adopts the R&R with respect to this finding. The R&R further concluded that the City of Akron lacked standing to bring a statutory public nuisance claim, and that the County of Summit, which had standing, was not limited only to injunctive relief under the statute. The Pharmacy Defendants object to the R&R's conclusion that § 4729.35 of the Ohio Revised Code does not limit the remedy that can be sought under the statute to an injunction, and Plaintiffs object to the R&R's conclusion that § 4729.35 limits who may maintain a nuisance action. The issue then, is whether § 4729.35 is limiting and if so, to what extent.

The operative statutes involved in Plaintiffs' Statutory Public Nuisance Claim are:

Ohio Rev. Code § 715.44(A) (emphasis added):[15]

A municipal corporation may abate ***any nuisance*** and prosecute ***in any court of competent jurisdiction***, any person who creates, continues, contributes to, or suffers such nuisance to exist.

---

[14] "'Harm' means death, physical injury to person, serious emotional distress, or physical damage to property other than the product in question. Economic loss is not 'harm.'" Ohio Rev. Code § 2307.71(A)(2).

[15] Page's Ohio Revised Code Annotated, Title 7: *Municipal Corporations*, Chapter 715: *General Powers*, §§715.37-715.44: Health and Sanitation, §715.44: Power to abate nuisance and prevent injury.

Ohio Rev. Code § 3767.03 (emphasis added):[16]

> ***Whenever a nuisance exists***, the attorney general; the village solicitor, city director of law, or other similar chief legal officer of the municipal corporation ***in which the nuisance exists***; the prosecuting attorney of the county in which the nuisance exists; the law director of a township that has adopted a limited home rule government under Chapter 504. of the Revised Code; or any person who is a citizen of the county in which the nuisance exists may bring an action in equity in the name of the state, upon the relation of the attorney general; the village solicitor, city director of law, or other similar chief legal officer of the municipal corporation; the prosecuting attorney; the township law director; or the person, to abate the nuisance and to perpetually enjoin the person maintaining the nuisance from further maintaining it.

Ohio Rev. Code § 4729.35 (emphasis added):[17]

> The violation . . . of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse . . . is hereby declared to . . . constitute a public nuisance. The attorney general, the prosecuting attorney of any county in which the offense was committed or in which the person committing the offense resides, or the state board of pharmacy may maintain an action in the name of the state ***to enjoin such person*** from engaging in such violation. Any action under this section shall be brought ***in the common pleas court of the county where the offense occurred or the county where the alleged offender resides***.

If § 4729.35 had ended after the first sentence, there would be no question as among the three statutes that the City of Akron would have the authority to bring an action to abate a nuisance caused by the violation of applicable drug laws. However, the subsequent sentences of § 4729.35 can be read as either limiting or expanding (or both). Section 4729.35 is potentially limiting, for example, in that it does not also list city directors of law, chief legal officers of municipal corporation, or law directors of townships as parties that may maintain a nuisance action. It is also potentially limiting in that it only mentions injunctive relief rather than (or in addition to) relief in the form of abatement (or equitable relief generally). However, as Plaintiffs point out, § 4729.35

---

[16] Page's Ohio Revised Code Annotated, Title 37: Health-Safety-Morals, Chapter 3767: Nuisances, §§3767.01-3767.11: Disorderly houses, §3767.03: Abatement of nuisance; bond.

[17] Page's Ohio Revised Code Annotated, Title 47: Occupations-Professions, Chapter 4729: Pharmacists; Dangerous Drugs, §§4729.27-4729.46: Prohibitions, §4729.35: Violations of drug laws as public nuisance.

might be read as an expansion of § 3767.03 in that it additionally allows the state board of pharmacy and the prosecuting attorney of the county in which the alleged offender resides to maintain a nuisance action.[18] It also provides jurisdiction in either the county where the offense occurred or the county where the alleged offender resides.

The R&R succinctly summarizes the applicable Ohio rule of statutory construction, "a court should construe various statutes in harmony unless their provisions are irreconcilably in conflict." R&R at 65 (citing Ohio Rev. Code § 1.51; *United Tel. Co. v. Limbach*, 643 N.E.2d 1129, 1131 (Ohio 1994)). In the event statutory provisions are irreconcilable, the special or local provision prevails. *See id.* Additionally, as before, the Court interprets the inclusion of certain elements in a statute to imply the intentional exclusion of others.

Here, § 4729.35 is a special or local provision. It is irreconcilable with §§ 715.44(A) and 3767.03 because the plain language of these sections explicitly allows the chief legal officer of ***any*** municipal corporation, for example a city law director, to bring an action for abatement of ***any*** nuisance, whereas § 4729.35—at least implicitly—excludes a city law director from bringing a nuisance action for violations of the drug laws. Further, even a statutorily authorized party may only bring an action to enjoin such violations, not one for abatement.

Thus, the Court concludes, as the R&R did, that the General Assembly's inclusion of the attorney general, county prosecuting attorney, and state board of pharmacy in § 4729.35 implies the intentional exclusion of a city law director. Similarly, the Court concludes, though the R&R did not, that the General Assembly's reference to "an action . . . to enjoin such person from engaging in such violation" implies the exclusion of other forms of relief. Ohio Rev. Code § 4729.35.

---

[18] As opposed to only the county prosecuting attorney in which the nuisance exists as allowed by section 3767.03.

While it may not have been the General Assembly's intent to limit the parties who can maintain a nuisance action or to limit the available relief, the Court declines to second guess the unambiguous text of the General Assembly's statute. Further, because § 4729.35 is a special or local provision, irreconcilable with the more general provision, the Court reads § 4729.35 as an exception to the general provision. Therefore, the Court adopts the R&R's conclusion that the City of Akron lacks standing to bring a statutory public nuisance claim but rejects the R&R's conclusion that Ohio Rev. Code § 4729.35 does not expressly limit the categories of relief available for a nuisance claim to an injunction.

### 3. Abrogation of the Negligence Claim

The R&R concluded that the OPLA does not abrogate Plaintiffs' negligence claims. R&R at 60. Distributor Defendants object to that determination. *See* Doc. #: 1079 at 12. As discussed above, the OPLA only abrogates civil actions that seek to recover compensatory damages for death, physical injury, or physical damage to property caused by a product. Distributor Defendants do not meaningfully develop any argument with respect to Plaintiffs' negligence claim other than to cite several cases where courts purportedly dismissed various tort claims as preempted by the OPLA. The cases are all distinguishable.

Defendants cite *Chem. Solvents, Inc. v. Advantage Eng'g, Inc.*, 2011 WL 1326034 (N.D. Ohio Apr. 6, 2011). Regarding the plaintiff's negligence claim, the *Chem. Solvents* court first determined that "the Plaintiff [was] not saying that the product itself was defective." *Id.* at *13. The court then held, "Thus, this is not a 'products liability' claim, but a claim premised upon subsequent negligent actions by Advantage. Accordingly, the Court finds this claim is not preempted by the OPLA." *Id.* (citing *CCB Ohio LLC v. Chemque, Inc.*, 649 F. Supp. 2d 757, 763–64 (S.D. Ohio 2009) ("Similarly, the Court finds actions for fraud and negligent misrepresentation as outside the scope of the OPLA's abrogation, as neither fit neatly into the definition of a

'common law product liability claim.'")). Here, Plaintiffs likewise are not asserting that the opioid products themselves are defective, rather that Defendants negligently permitted (or even encouraged) diversion of those products.

Defendants also cite *McKinney v. Microsoft Corp.*, No. 1:10-CV-354, 2011 WL 13228141 (S.D. Ohio May 12, 2011). *McKinney* is a traditional products liability case where the plaintiff, in addition to his products liability claim under the OPLA, asserted a claim for negligent manufacture (i.e. a defective product claim), the exact type of claim considered by the General Assembly when it overruled *Carrel*. Plaintiffs' negligence claim in this case, again, does not assert that Defendants' opioids were defective.

Finally, Defendants turn to *Leen v. Wright Med. Tech., Inc.*, 2015 WL 5545064, at *2 (S.D. Ohio Sept. 18, 2015). In *Leen*, the plaintiff did not oppose the defendant's abrogation arguments in the motion to dismiss, so the court dismissed the common law negligence claim without considering the merits. *See id.* Therefore, based on this Court's analysis of the OPLA and the cases cited by Defendants, the Court adopts the R&R's conclusion that Plaintiffs' negligence claim is not abrogated.

Defendants also assert that the R&R's reliance on *Cincinnati v. Beretta U.S.A. Corp.* is misplaced because, they claim, it was effectively overruled by the General Assembly's amendments to the OPLA. 768 N.E.2d 1136 (Ohio 2002); *see* Doc. #: 1079 at 14. Whether and to what extent the OPLA abrogates negligence claims is a separate and distinct question from whether there is a common law duty to prevent or attempt to prevent the alleged negligent creation of an illicit secondary market.

As previously stated, the OPLA does not abrogate Plaintiffs' negligence claim, which seeks only relief from economic losses. However, even if the Court had found that Plaintiffs' negligence

32

claim was abrogated, it does not follow that *Beretta's* analysis of what constitutes a legal duty in Ohio is somehow flawed.[19] Thus, *Beretta's* discussion of Ohio common law duty is still relevant to the present case and is analyzed further below.

### E. Negligence

The R&R concluded that Plaintiffs have pled sufficient facts to plausibly support their claims that Defendants owed them a duty of care, that their injuries were proximately and foreseeably caused by Defendants' failure to take reasonable steps to prevent the oversupply of opioids into Plaintiffs' communities, and that their claim is not barred by the economic loss doctrine. R&R at 74-85. Defendants object to the finding that they owed Plaintiffs any duty and the conclusion that the economic loss doctrine does not bar Plaintiffs' claim.

### 1. Duty of Care

Defendants make several objections to the R&R's analysis regarding the duty of care. "The existence of a duty of care, as an element of a negligence claim under Ohio law, depends on the foreseeability of the injury, and an injury is 'foreseeable' if the defendant knew or should have known that his act was likely to result in harm to someone." 70 Ohio Jur. 3d Negligence § 11 (citing *Bailey v. U.S.*, 115 F. Supp. 3d 882, 893 (N.D. Ohio 2015)). The R&R concluded that "it was reasonably foreseeable that [Plaintiffs] would be forced to bear the public costs of increased harm from the over-prescription and oversupply of opioids in their communities if Defendants failed to implement and/or follow adequate controls in their marketing, distribution, and dispensing of opioids," and therefore, that "Plaintiffs have plausibly pleaded facts sufficient to establish that Defendants owed them a common law duty." R&R at 78-79.

---

[19] The *Beretta* court determined that the defendants' negligent manufacturing, marketing, and distributing, and failure to exercise adequate control over the distribution of their products created an illegal, secondary market resulting in foreseeable injury and that from Defendants' perspective, the City of Cincinnati was a foreseeable plaintiff. *See Beretta*, 768 N.E.2d at 1144.

First, Manufacturer Defendants assert that to the extent they owe a statutory duty, it is owed to the U.S. Drug Enforcement Agency, not to plaintiffs. Doc. #: 1082 at 14. They also assert that they have no legal duty under 21 U.S.C. § 827 or 21 C.F.R. § 1301.74(b) to monitor, report, or prevent downstream diversion. *Id.* These objections are not well-taken. The R&R expressly did not reach whether any Defendant owed a duty to Plaintiffs under the statutes or regulations. R&R at 79. It also did not address whether the statutes or regulations create a common law duty under a negligence *per se* theory. *Id.* at n.49. The R&R instead concluded that the common law duty pled by Plaintiffs was sufficient to support a negligence claim. *See* R&R at 79. This Court agrees.

Distributor Defendants assert that the R&R "refus[ed] to confront a key duty question [(whether a duty, if one exists, flows to the County)] head on." Doc. #:1079 at 14. They assert that "the R&R identified no Ohio case recognizing a common-law duty to *report or halt suspicious orders of controlled substances*," and "even if there were a common-law duty to *report or halt suspicious orders*, no authority suggests that such a duty runs to the cities or counties." *Id.* (emphasis added). The duty that Plaintiffs allege is not so narrow. Plaintiffs allege that Defendants, like all reasonably prudent persons, have a duty "to not expose Plaintiffs to an unreasonable risk of harm." SAC at 312.

In reaching its conclusion on the duty of care, the R&R relies on *Cincinnati v. Beretta*. The R&R provides this summary:

> In *Cincinnati v. Beretta*, the Ohio Supreme Court addressed the question of whether gun manufacturers owed a duty of care to a local government concerning harms caused by negligent manufacturing, marketing and distributing of firearms. *Beretta* involved allegations that the defendants failed to exercise sufficient control over the distribution of their guns, thereby creating an illegal secondary market in the weapons. The *Beretta* court concluded that the harms that resulted from selling these weapons were foreseeable—that Cincinnati was a foreseeable plaintiff. 768 N.E.2d at 1144. Plaintiffs argue that the harm caused by the marketing and distribution of opioids are similarly foreseeable.

34

R&R at 75-76. Here, taking Plaintiffs' allegations as true, by failing to administer responsible distribution practices (many required by law), Defendants not only failed to prevent diversion, but affirmatively created an illegal, secondary opioid market. Opioids are Schedule II drugs. Despite Manufacturer Defendants' marketing campaign to the contrary it is well known that opioids are highly addictive. When there is a flood of highly addictive drugs into a community it is foreseeable—to the point of being a foregone conclusion—that there will be a secondary, "black" market created for those drugs. It is also foreseeable that local governments will be responsible for combatting the creation of that market and mitigating its effects. Thus, the Court affirms the R&R's conclusion that Defendants owe Plaintiffs a common law duty of care.

### 2. Economic Loss Doctrine

Defendants also object to the R&Rs conclusion that Plaintiffs' negligence claim is not precluded by the economic loss doctrine. Defendants' objections merely rehash arguments already made in their motions to dismiss. The R&R does a thorough analysis of the application of the economic loss rule, and this Court finds no fault with it. The R&R states:

> The economic loss rule recognizes that the risk of consequential economic loss is something that the parties can allocate by agreement when they enter into a contract. This allocation of risk is not possible where, as here, the harm alleged is caused by involuntary interactions between a tortfeasor and a plaintiff. Thus, courts have noted that in cases involving only economic loss, the rule "will bar the tort claim if the duty arose only by contract." *Campbell v. Krupp*, 961 N.E.2d 205, 211 (Ohio Ct. App. 2011). By contrast, "the economic loss rule does not apply—and the plaintiff who suffered only economic damages can proceed in tort—if the defendant breached a duty that did not arise solely from a contract." *Id.*; *see also Corporex*, 835 N.E.2d. at 705 ("When a duty in tort exists, a party may recover in tort. When a duty is premised entirely upon the terms of a contract, a party may recover based upon breach of contract."); *Ineos USA LLC v. Furmanite Am., Inc.*, 2014 WL 5803042, at *6 (Ohio Ct. App. Nov. 10, 2014) ("[W]here a tort claim alleges that a duty was breached independent of the contract, the economic loss rule does not apply.").

R&R at 84 (citing *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 835 N.E.2d 701 (Ohio 2005)).

Thus, the Court concurs with and affirms the R&R's analysis of the economic loss rule and its

conclusion that it is not applicable to Plaintiffs' tort claims.

### F. The Injury Through Criminal Acts Objections

The R&R concluded that Defendants' motion to dismiss Plaintiffs' Injury Through

Criminal Acts Claim should not be dismissed. R&R at 88-90. Defendants' primary objection to

this conclusion merely rehashes the argument initially made in their motions to dismiss: that they

have not been convicted of a crime. Their objection cites no new facts or case law that were not

already presented to and considered by Magistrate Judge Ruiz. Whether Ohio Rev. Code

§ 2307.60(A)(1) requires an underlying conviction is a question this Court recently certified to the

Ohio Supreme Court in *Buddenberg v. Weisdack*, Case No. 1:18-cv-00522, 2018 WL 3159052

(N.D. Ohio June 28, 2018) (Polster, J.); *see also* 10/24/2018 Case Announcements, 2018-Ohio-

4288 (available at http://www.supremecourt.ohio.gov/ROD/docs/) (accepting the certified

question). In *Buddenberg*, this Court denied the defendants' motion to dismiss and ordered,

"Defendants may renew their challenge in the form of a motion for summary judgment after

discovery and further research." *Buddenberg*, 2018 WL 3159052 at *6. Nothing in any

Defendants' briefing convinces this Court that the same approach is not appropriate here.

Therefore, the Court adopts the R&R with respect to Section III.I. Defendants' objections are

overruled.[20]

### G. Unjust Enrichment

The R&R concluded that Defendants' motion to dismiss Plaintiffs' Unjust Enrichment

Claim should be denied. *See* R&R at 91-95. The issue at the heart of Defendants' objections to the

---

[20] Should the Ohio Supreme Court rule that a criminal conviction is required, this claim will of course be dismissed.

R&R's conclusion is whether Plaintiffs conferred a benefit upon the Defendants. Defendants argue that "the rule in Ohio is that to show that a plaintiff conferred a benefit upon a defendant, an economic transaction must exist between the parties." Doc. #: 1078 at 13 (internal quotations omitted) (citing *Ohio Edison Co. v. Direct Energy Bus.*, LLC, No. 5:17-cv-746, 2017 WL 3174347 (N.D. Ohio July 26, 2017); *Caterpillar Fin. Servs. Corp. v. Harold Tatman & Sons Enters., Inc.*, 50 N.E.3d 955 (Ohio Ct. App. 2015); *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 684 F. Supp. 2d 942 (N.D. Ohio 2009)).

This is not the rule in Ohio. All the cases cited by Defendants refer back to one sentence in *Johnson v. Microsoft Corp.*: "*The facts in this case* demonstrate that no economic transaction occurred between Johnson and Microsoft, and, therefore, Johnson cannot establish that Microsoft retained any benefit 'to which it is not justly entitled.'" 834 N.E.2d 791, 799 (Ohio 2005) (emphasis added) (citing *Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 141 N.E.2d 465 (Ohio 1957)). This holding is expressly limited to the facts of that case. *Johnson* does state the rule in Ohio, however. It provides: "The rule of law is that an *indirect purchaser* cannot assert a common-law claim for restitution and unjust enrichment against a defendant without establishing that a benefit had been conferred upon that defendant by the purchaser." *Id.* (emphasis added).

As Defendants are quick to point out, Plaintiffs do not claim to be purchasers of opioids, indirect or otherwise. *See, e.g.*, Doc. #: 1078 at 11 ("Plaintiffs do not allege that *they* purchased opioids from the Pharmacy Defendants."). As such, the R&R rightly concludes that "Plaintiffs' theory of recovery is not based on a financial transaction, therefore the claim is not barred by *Johnson's* limiting indirect purchasers from maintaining unjust enrichment claims against parties other than those with whom they dealt directly." R&R at 92.

Plaintiffs' claim is that "Plaintiffs have conferred a benefit upon Defendants by paying for Defendants' externalities: the cost of the harms caused by Defendants' improper distribution

practices." SAC at 328. According to Plaintiffs, Defendants' conduct allowed the diversion of opioids and thereby created a black market for their drugs. *See id.* at 7. This black market allowed Defendants to continue to ship large volumes of opioids into Plaintiffs' communities at great profit to Defendants and great expense to Plaintiffs. *See id.* at 328. Under Ohio law, "one is unjustly enriched if the retention of a benefit would be unjust, and one should not be allowed to profit or enrich himself or herself inequitably at another's expense." 18 Ohio Jur. 3d Contracts § 279. Therefore, for the reasons stated, Defendants' objections are overruled. The Court adopts Section III.J of the R&R.

III.

Having considered Plaintiffs' Second Amended Complaint, Defendants' Motions to Dismiss, Plaintiffs' Omnibus Response, Defendants' Replies, Magistrate Judge Ruiz's Report and Recommendation, the parties' Objections to the R&R, and their Responses, Defendants' Motions to Dismiss, Doc. ##: 491, 497, 499, are **DENIED** with the following exception: The City of Akron's Statutory Public Nuisance claim is dismissed for lack of standing under Ohio Rev. Code § 4729.35. The County of Summit's Statutory Public Nuisance claim is limited to seeking injunctive relief.

It is accurate to describe the opioid epidemic as a man-made plague, twenty years in the making. The pain, death, and heartache it has wrought cannot be overstated. As this Court has previously stated, it is hard to find anyone in Ohio who does not have a family member, a friend, a parent of a friend, or a child of a friend who has not been affected.

Plaintiffs have made very serious accusations, alleging that each of the defendant Manufacturers, Distributors, and Pharmacies bear part of the responsibility for this plague because of their action and inaction in manufacturing and distributing prescription opioids. Plaintiffs allege that Defendants have contributed to the addiction of millions of Americans to these prescription opioids and to the foreseeable result that many of those addicted would turn to street drugs.

38

While these allegations do not fit neatly into the legal theories chosen by Plaintiffs, they fit nevertheless. Whether Plaintiffs can prove any of these allegations remains to be seen, but this Court holds that they will have that opportunity.

The Court, thus having ruled on all of Defendants' Motions to Dismiss, orders Defendants to file their Answers to Plaintiffs' Corrected Second Amended Complaint, Doc. #: 514, no later than January 15, 2019.

**IT IS SO ORDERED.**


 /s/ Dan Aaron Polster  *December 19, 2018*
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**